**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 25 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

vs.

ROBERT M. COCHRAN,

      Defendant-Appellant.

No. 96-6305

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA.)
(D.C. No. CR 95-128-T)

---

B.J. Rothbaum, Jr. (Drew Neville and Russell Cook with him on the brief), Linn &
Neville, P.C., Oklahoma City, Oklahoma for Defendant-Appellant.

Susan Dickerson Cox, Assistant U.S. Attorney (Mary C. Spearing, Acting U.S. Attorney,
Mary M. Smith and Michael C. James, Assistant U.S. Attorneys, with her on the brief),
Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Richard H. Walker, General Counsel, Eric Summergard, Principal Assistant General
Counsel, Adam C. Pritchard, Attorney, and Paul Gonson, Solicitor, Securities and
Exchange Commission, Washington, D.C. for Amicus Curiae, The Securities and
Exchange Commission.

---

Before BALDOCK, KELLY and LUCERO, Circuit Judges.

---

KELLY, Circuit Judge.

Defendant-appellant Robert M. Cochran appeals from his conviction on five counts of wire fraud, 18 U.S.C. §§ 2, 1343, 1346, one count of interstate transportation of stolen property, 18 U.S.C. §§ 2, 2314, and two counts of money laundering, 18 U.S.C. §§ 1956, 1957. The jury acquitted on seven counts of wire fraud and six counts of money laundering and also acquitted Mr. Cochran's codefendant. Mr. Cochran was sentenced to 87 months imprisonment, ordered to provide restitution of up to $489,241.09, to pay a fine of $50,000 and $400 in special assessments and, following release, to serve three years on probation. We stayed his reporting date and expedited his appeal.[1] Our jurisdiction arises under 28 U.S.C. § 1291. We reverse.

Background

This is a case about greed, and not only that of Defendant. That said, greed and criminal liability are not necessarily synonymous. Mr. Cochran was the head of the Oklahoma City Municipal Bond Underwriting Department of Stifel, Nicolaus & Company, Inc. (Stifel). Stifel participated in underwriting several municipal bond issues and received compensation from both the issuers and various third-party financial institutions. The pertinent transactions for our purposes include: (1) a 1992 Oklahoma City Airport Trust transaction (OCAT transaction) where the government charged that

---

[1] In light of our disposition, we deny Mr. Cochran's motion for release pending appeal as moot.

Mr. Cochran and his acquitted codefendant Michael B. Garrett received the benefit a $489,241.09 secret payment, and (2) a 1992 Sisters of St. Mary Healthcare System transaction (SSM transaction) where the government charged that Mr. Cochran received the benefit of a $100,000 secret payment.

## A. OCAT Transaction

The OCAT transaction involved an issuance of almost $77 million in taxable 20-year revenue bonds by the Oklahoma City Airport Trust Authority to finance a "transfer center" to be leased by the federal Bureau of Prisons. Stifel was named the co-managing underwriter for this "BBB-rated" bond issue and received a portion of the 3.2 percent underwriting fee ($2.5 million). The bonds were somewhat unique and carried a lower credit rating.

Because interest received by the bondholders was taxable, OCAT could earn an unrestricted amount of interest on the bond proceeds. In addition to acting as underwriter for the offering, Stifel also brokered a collateralized guaranteed investment contract between OCAT and the Postipankki Bank, a Finnish bank with branches in the United States. Such a contract allows the issuer to invest the bond proceeds at a fixed rate until needed and earn a return in excess of most short-term investments.

As co-participating broker, Stifel contacted Pacific Matrix Financial Corporation, a California money broker, to find a financial institution to provide the contract. Pacific

Matrix selected Postipankki. Stifel received a fee of $529,241.09 from Postipankki, due to the following series of events. On bid day, Postipankki bid 7.05 percent on the debt service reserve funds and 4.2 percent on the construction and capitalized interest funds of the bond issue. Stifel then instructed Pacific Matrix to deduct 50 and 25 basis points, respectively, from the gross bid of Postipankki as the broker fee. Postipankki then reduced its original bid from 7.05 to 7.0 percent on the debt service reserve fund and the net bid figures presented to OCAT were 6.5 percent (7.0 percent less 50 basis points) and 3.95 percent (4.2 percent less 25 basis points), to account for the broker fees charged by Stifel and Pacific Matrix. Gross or net, Postipankki submitted the highest bid. Tr. 1270. Stifel and Pacific Matrix had agreed to split the broker fee 85%-15%, respectively, with Stifel also recouping $40,000 (based on a previous transaction) from the Pacific Matrix share. Postipankki paid Stifel through an affiliated company of Mr. Cochran, American Investment Corporation (AIC), resulting in a net broker fee for Stifel of $489,241.09. This was later transferred to Stifel's account by Mr. Cochran.

OCAT was unaware of the fee (the difference between the gross and net bids) or the fee split, although Mr. Cochran testified that his codefendant had informed him that disclosure had been made. Mr. Luther Trent, OCAT director, testified that the Stifel fee never came up but he presumed that Pacific Matrix would receive a fee, "just logic told me the guy does it for something." Tr. 1515. He also indicated that the return from the guaranteed investment contract earned OCAT more than $1.5 million, and that the net

rates received were excellent rates, over twice what OCAT was making on short term Treasury securities.  Tr. 1527.

### B.  SSM Transaction

The Sisters of Saint Mary Healthcare System is a Missouri not-for-profit corporation that operates eighteen hospitals and three nursing homes.  In an effort to secure more favorable financing, the SSM transaction involved a refunding issuance of more than $265 million of tax-exempt bonds, with Stifel as the co-senior managing underwriter.  Stifel recommended that SSM purchase a forward supply contract.  A forward supply contract is a financial instrument to invest bond refunding proceeds during the period after securities in an escrow account are redeemed and before the date when the funds must be distributed.  It is beneficial because the maturity dates of the investment securities in an escrow account often cannot be identical to the redemption dates of the older bonds that are being refunded by the new bond issue.  For example, $1 million of Treasury securities in an escrow account may mature on April 1, when the $1 million needed to repay principal on the older bonds is not due until April 15.

Stifel arranged for Sakura Global Capital (SGC) to provide the forward supply contract.  SGC had bid $400,000 to be paid to SSM.  Unlike the OCAT transaction, the SSM transaction was structured to generate tax-exempt interest for the bondholders which meant that the yield on the investment of the refunding bond proceeds, including the

forward supply contract, was restricted. Bond counsel, therefore, required Stifel to certify that, other than the $400,000 specified in the forward supply agreements, no payments would be made "by or on behalf of SGC to or for the benefit of SSMHC" and "by or on behalf of SGC to any person." Although Stifel and SGC certified that no such payments were made, the latter representation was rendered incorrect when Mr. Cochran sought and received a $100,000 fee from SGC subsequent to the certification. At trial, Mr. Cochran contended that he had disclosed this fee to SSM's chief financial officer who had no recollection. The fee was billed by AIC in a "corrected billing," attributed to an unrelated bond transaction involving Mercer County, New Jersey and paid by SGC. The fee was later transferred from AIC to Stifel's account by Mr. Cochran.

Counts 3 and 5 of the indictment charged Mr. Cochran and his codefendant with wire fraud in connection with the OCAT transaction, specifically a telephone call from Stifel to Pacific Matrix directing the Postipankki bid reduction (count 3) and a fax transmission from Pacific Matrix to Oklahoma bond counsel reflecting the reduced bid amount (count 5). Counts 9-11 charged Mr. Cochran with wire fraud (deprivation of honest services) in connection with the SSM transaction, specifically the telephone call where Stifel and SGC employees agreed that the Stifel fee would be billed to the Mercer County, New Jersey bond issue (count 9), the fax transmission accomplishing same (count 10), and the wire transfer of the $100,000 fee from New York to Oklahoma (count 11). Count 2 and 12 charged money laundering of the proceeds of the above two wire

fraud schemes (and another upon which conviction was not had) by transferring the proceeds from the AIC account to Stifel. Count 6 charged interstate transportation of money taken by fraud, specifically the $529,241.09 fee check from Postipankki to AIC.

Discussion

On appeal, Mr. Cochran contends that it was error (1) to construe 18 U.S.C. § 1343 to criminalize nondisclosure of fees received by an investment firm in the absence of proof of a duty to disclose such information, (2) to construe 18 U.S.C. § 1343 to criminalize such nondisclosure in the absence of proof that the alleged nondisclosure caused, or was intended to cause, a loss of money or property to which the alleged "victim" had some claim of right, and (3) to construe 18 U.S.C. § 1343, as amended by 18 U.S.C. § 1346, to criminalize nondisclosure of receipt of a fee by an underwriter in the absence of proof that knowledge of the receipt of the fee would have had some tangible effect on the alleged "victim." He also contends that (4) retroactive imposition of a duty to disclose information upon a private individual in a private business transaction as a predicate for criminal liability is a deprivation of due process of law, (5) insufficient evidence supports the wire fraud convictions, (6) it was prejudicial to submit alternative theories of wire fraud to the jury in the disjunctive when such theories are charged in the indictment in the conjunctive, (7) his conviction as an aider and abettor on the OCAT

- 7 -

wire fraud counts is precluded by the acquittal of his codefendant on the same counts, and (8) reversal of the wire fraud convictions requires reversal on the other counts of conviction. We address only those arguments necessary to resolve the appeal.

Mr. Cochran contends that his convictions on the wire fraud counts cannot stand due to a failure of proof. In essence, his challenge is to the sufficiency of the evidence. See United States v. Catalfo, 64 F.3d 1070, 1076 (7th Cir. 1995), cert. denied, 116 S. Ct. 1683 (1996). We review the evidence and the inferences in the light most favorable to the government to determine whether a rational jury could have found a defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Hooks, 780 F.2d 1526, 1529-31 (10th Cir.), cert. denied, 475 U.S. 1128 (1986).

The elements of wire fraud under 18 U.S.C. § 1341 are: "(1) a scheme or artifice to defraud or obtain money by false pretenses, representations or promises; and (2) use of interstate wire communications to facilitate that scheme." United States v. Drake, 932 F.2d 861, 863 (10th Cir. 1991). A scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential; by contrast a scheme to obtain money by false pretenses, representations or promises focuses instead on the means by which the money is obtained and particular false pretenses, representations or promises must be proved. United States v. Cronic, 900 F.2d 1511, 1513-14 (10th Cir. 1990).

"[A] scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." United States v. Hanson, 41 F.3d 580,

583 (10th Cir. 1994). The objective reference to "persons of ordinary prudence or comprehension" assists in determining whether the accused's conduct was "calculated to deceive." Drake, 932 F.2d at 864. Fraudulent intent is required. United States v. Themy, 624 F.2d 963, 965 (10th Cir. 1980). That said, a scheme to defraud by false representations may be accomplished by patently false statements or statements made with a reckless indifference as to their truth or falsity, and deceitful concealment of material facts may constitute actual fraud. Williams v. United States, 368 F.2d 972, 975 (10th Cir. 1966), cert. denied, 386 U.S. 997 (1967); Gusow v. United States, 347 F.2d 755, 756 (10th Cir.), cert. denied, 382 U.S. 906 (1965). "[E]ven though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations." Themy, 624 F.2d at 965.

### A. OCAT Transaction

Mr. Cochran argues that he had no duty to disclose (to OCAT) the Stifel commission on the guaranteed investment contract placed with Postipankki bank. In deciding this issue, we resolve the conflicts in underlying evidence in favor of the government--thus, for purposes of our analysis, Mr. Cochran was involved in the OCAT reinvestment transaction and the Stifel fee was not disclosed to OCAT. See United States v. Brown, 79 F.3d 1550, 1555-56 (11th Cir. 1996). Mr. Cochran bases his argument on the Supreme Court's holding in Chiarella v. United States, 445 U.S. 222, 235 (1980), that

- 9 -

"[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." See also United States v. Irwin, 654 F.2d 671, 679 (10th Cir. 1981), cert. denied, 455 U.S. 1016 (1982) ("there can be no criminal conviction for failure to disclose when no duty to disclose is demonstrated"). He points out that the government completely failed to prove the existence of a known duty on his part to disclose the fee. At oral argument, the government could not inform us of any statute, regulation, common law or contractual provision that required disclosure of the fee. Our subsequent reading of the testimony confirms a lack of public or private regulation concerning reinvestment broker fees during the pertinent time period. Tr. 1024-29 (Pacific Matrix reinvestment broker).

While a fiduciary relationship is not an essential element of a wire fraud prosecution, United States v. Allen, 554 F.2d 398, 410 (10th Cir.), cert. denied, 434 U.S. 836 (1977), it can trigger a duty of disclosure as can some other relationship of trust and confidence between the parties. Chiarella, 445 U.S. at 228. In a fiduciary-like relationship, "a reasonable person is always permitted to rely on the recommendations of a particular person; and, certain people must always disclose facts where nondisclosure could result in harm." Brown, 79 F.3d at 1557. Even apart from a fiduciary duty, in the context of certain transactions, "a misleading omission[] is actionable as fraud . . . if it is intended to induce a false belief and resulting action to the advantage of the misleader and

the disadvantage of the misled." Emery v. American General Finance, Inc., 71 F.3d 1343, 1348 (7th Cir. 1995).

The evidence in this case does not support such a duty, nor does it support the government's alternate theory that Stifel's nondisclosure coupled with its allegedly affirmative misstatements of fact (the net bids) induced false beliefs regarding the amount of the Postipankki bid to OCAT. In reality, we analyze the government's alternate theory virtually the same way as its nondisclosure theory because the alternate theory presupposes a duty to disclose with any statements unaccompanied by such disclosure deemed fraudulent. See Reynolds v. East Dyer Development Co., 882 F.2d 1249, 1252-53 (7th Cir. 1989).

The government makes much of the underwriting relationship between Stifel and OCAT, arguing that it created a fiduciary duty or relationship of trust and confidence between the parties requiring disclosure of the spread between the gross rate and net rate and the fee paid by Postipankki to Stifel. While it is true that Stifel was co-managing underwriter of the bonds (with Leo Oppenheim & Co.), the notion that this engagement somehow extended gratuitously to reinvestment of $54 million in bond proceeds is not only unsupported, but also is contrary to the record. Stifel underwrote the bonds, and eventually placed them despite their credit risk. Tr. 3473-75. The bond closing occurred on November 12, 1992. Negotiations for the guaranteed investment contract transactions occurred thereafter, during the reinvestment period. Id. 1541-42.

Mr. Trent of OCAT was aware not only that investment of the proceeds was different than the actual underwriting process, but also that the bond issue had closed and the underwriting period had ended. Id. 1541-42, 1570. During the reinvestment phase, OCAT did not seek competitive bidding on the guaranteed investment contract. Although Mr. Trent testified that he thought Stifel and Oppenheim ought to advise OCAT on the selection of an investment contract because they had structured the bond issue and had an interest in making sure that bond issue did not fall short on construction, he also testified that he did not expect Stifel to take an active role, but rather to advise the bond trustee. Tr. 1512-13, 1542-43.

Despite the government's dogged insistence of Mr. Trent's actual reliance on Stifel, Mr. Trent's testimony is unanimous that he looked to the bond trustee, not Stifel, to make the reinvestment decision and to evaluate and approve the guaranteed investment contract. Id. at 1511, 1515, 1527, 1531, 1571-77. The bond trustee was no doubt in a fiduciary relationship vis-a-vis OCAT.

Mr. Trent's testimony that he expected Stifel to work for free on the reinvestment phase and that had Stifel wanted a fee, it should have asked, id. 1542-43, does not create a duty of disclosure on the part of Stifel as a coparticipating broker in the reinvestment phase. Mr. Trent admitted that neither Mr. Cochran nor his codefendant had a fiduciary relationship with OCAT during the reinvestment phase. Id. 1574-75. This is not surprising given that Mr. Trent had been involved in seventeen or eighteen bond issues,

had "constant contact" with underwriting firms in Oklahoma City, and often sought their advice. Id. 1517-18. He conceded that in previous OCAT transactions in which he has participated, OCAT paid the trustee bank a fee for reinvestment of bond proceeds. Id. 1552. No one contends that Pacific Matrix, as coparticipating broker in the reinvestment phase, was not entitled to a fee or was required to disclose its fee to OCAT.[2] During the time period in question, Pacific Matrix routinely split fees with investment bankers, including Stifel and "[j]ust about everybody we dealt with." Id. at 1034. Nothing on this record suggests any principled distinction between Stifel and Pacific Matrix.

Although the representative from Postipankki testified that he was upset with the size of the fee, he discussed the circumstances with his boss and determined that Postipankki had no grounds to protest the fee. Id. at 1733. He asked Pacific Matrix if the

_____

[2]     Mr. Trent testified on direct:

Q.     Were you even aware that there was, in fact, a broker fee?

A.     I would tell you that I would presume there would have been one. I would have no idea or nothing to compare it as to figuring out what an amount would be or anything else. You know, I mean, just logic told me that the guy does it for something. You know, he's not -- he can't do it just because he likes to broker monies, but we didn't get involved in that, because it was my presumption that would be part of the bank [bond trustee] transaction.

Tr. 1515.

- 13 -

issuer (OCAT) had been informed of the fee and was told that disclosure was unnecessary because it was a taxable deal. Id. at 1716. He verified this with bank counsel and felt no duty to disclose the fee to the issuer. Id. at 1717.

The record makes it clear that even among the government's industry witnesses no consensus existed concerning proper reinvestment fee disclosure. Compare id. at 202 (disclosure not required where interest on issue is tax-exempt (although verbal disclosure given); required where interest is taxable) with id. at 1716 (disclosure required where interest on issue tax exempt; not required where interest is taxable). In July 1993, after the events in question the Internal Revenue Service proposed rules concerning the fees on tax-exempt issues, including a five basis point fee limitation as a safe harbor. Id. at 1026-27, 3185-86. Regardless, the government's standardless theory on the OCAT transaction (which resulted in the highest reinvestment rate OCAT had ever received) "would put federal judges in the business of creating what in effect would be common law crimes, i.e., crimes not defined by statute." United States v. Holzer, 816 F.2d 304, 309 (7th Cir), cert. granted and judgment vacated on other grounds, 484 U.S. 807 (1987). See also Matter of EDC, Inc., 930 F.2d 1275, 1281 (7th Cir. 1991) (rejecting lack of moral uprightness as a standard for wire fraud and mail fraud). The wire fraud counts pertaining to the OCAT transaction must be reversed.

## B. SSM Transaction

Under 18 U.S.C. § 1346, a "scheme or artifice to defraud" includes "a scheme or artifice to deprive another of the intangible right of honest services." The government charged Mr. Cochran with wire fraud alleging he attempted to deprive SSM and its bondholders of the right to Stifel's honest services. We are thus confronted with an application of § 1346 to a commercial transaction outside the public sector.

At the time of the transaction, a representative of SGC believed that the escrow side of the transaction required disclosure of fees, but the forward supply side did not; moreover, the evidence was, at best, equivocal on whether SGC had a duty independent of contract to disclose to SSM the $100,000 payment to Stifel. Tr. 2080, 2337. However, in resolving Mr. Cochran's challenge to the sufficiency of the evidence, we again take the facts in the light most favorable to the government. See Brown, 79 F.3d at 1555-56. Thus, Mr. Cochran (1) obtained the forward supply contract on behalf of SSM pursuant to a letter agreement, Aplt. App. 4126-28, (2) violated the representation contained in a certification to bond counsel that the provider of the contract (SGC) paid no other fee than to SSM, (3) did not disclose the $100,000 fee to SSM, and (4) invoiced the additional fee to another account.

Mr. Cochran argues that the SSM transaction could not constitute wire fraud absent proof of some potential loss or injury to the alleged victims. He asserts that "it is undisputed that the receipt of the $100,000 fee by Stifel from Sakura did not, and could

- 15 -

not, have any adverse economic effect upon SSM and it is undisputed that interest payable on the bonds issued by SSM was and is exempt from federal income taxation." Aplt. Reply Br. 18. Mr. Cochran bases his argument on United States v. Jain, 93 F.3d 436, 442 (8th Cir. 1996), which held that in the absence of actual harm to the victim, evidence independent of the alleged scheme is required to show fraudulent intent. See also United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994).

Assuming without deciding that § 1346 has application where a private actor or quasi-private actor is deprived of honest services in the context of a commercial transaction, it would give us great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing. Cf. United States v. Sawyer, 85 F.3d 713, 728 (1st Cir. 1996) ("To allow every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced."); United States v. Dowling, 739 F.2d 1445, 1449 (9th Cir. 1984) (rejecting contention that unlawful conduct alone constitutes fraud for purposes of the mail fraud statute), rev'd on other grounds, 473 U.S. 207 (1985). We agree with the Eighth Circuit, however, that § 1346 must be read against a backdrop of the mail and wire fraud statutes, thereby requiring fraudulent intent and a showing of materiality.[3] Jain, 93 F.3d at 442; see also Sawyer, 85 F.3d at 725, 729. We

---

[3] See United States v. Gray, 96 F.3d 769, 774-75 (5th Cir. 1996) (citing United States v. Ballard, 663 F.2d 534, 540-42 (5th Cir. 1981), modified on reh'g, 680 F.2d 352 (5th Cir. 1982)). Although materiality is not an independent element of a wire

acknowledge that where actual harm exists as a natural and probable result of a scheme, fraudulent intent may be inferred.  D'Amato, 39 F.3d at 1257.  But we agree that in the absence of actual or potential harm, evidence independent of the alleged scheme must be adduced to show fraudulent intent towards the alleged victims.  Jain, 93 F.3d at 442; D"Amato, 39 F.3d at 1257.

Because the SSM refunding issue was yield restricted, the $100,000 payment from Sakura to Stifel could not have been paid to or on behalf of SSM without jeopardizing the tax-exempt status of the bonds.  Indeed, an SSM administrator was upset to find out that

---

fraud prosecution, "there is a materiality aspect to the determination whether the acts of an accused give rise to a scheme to defraud," that "is appropriately submitted to the jury as one component of the larger factual question as to the existence of fraud and a scheme to defraud."  United States v. Daily,  921 F.2d 994, 1006 (10th Cir. 1990), cert. denied, 502 U.S. 952 (1991).  See also Aplt. App. 153-54 (jury instruction on wire fraud).  A misrepresentation is material if it has a natural tendency to influence or is capable of influencing the decision maker.  See United States v. Gaudin, 115 S.Ct. 2310, 2313 (1995); Kungys v. United States, 485 U.S. 759, 770 (1988); Daily, 921 F.2d at 1003 n.9; United States v. Haddock, 956 F.2d 1534, 1550 (10th Cir.), cert. denied, 506 U.S. 828 (1992), abrogated, United States v. Wells, 117 S. Ct. 921 (1997); United States v. Halbert, 712 F.2d 388, 390 (9th Cir. 1983), cert. denied, 465 U.S. 1005 (1984).

United States v. Wells, holding that materiality of the falsehood is not an element of the crime of making a false statement to a federally insured bank under 18 U.S.C. § 1014, is not to the contrary.  In Wells, the Court concluded that the term "false statement" contained in the statute carried no common law meaning requiring materiality.  Id., 117, S.Ct. at ___; 1997 WL 78052, *6.  However, fraud has always required that misrepresentations or omissions be material to be actionable.  See BMW of North America, Inc. v. Gore, 116 S. Ct. 1589, 1600-01 (1996); United States v. Carpenter, 95 F.3d 773, 778 (9th Cir. 1996) (Ferguson, J., dissenting) ("In all fraud cases (civil and criminal) only one kind of misrepresentation matters--a *material* representation.  . . . Quite simply, not all lies support liability."), cert. denied, 1997 WL 47820.

- 17 -

SSM could not share in a $1 million profit on the reinvestment phase of the transaction because of the yield restriction. Tr. 2523-27. Thus, the government does not argue that SSM was deprived of the additional fee. Rather, "the sole theory presented to the jury on the SSM transaction was the right to honest services breached by defendant's conduct in failing to disclose the secret Stifel fee through the false broker certification and through the 'corrected' billing to the Mercer County transaction." Aplee. Br. at 23 n.14.

Stifel completed a broker's certificate that represented that no payments would be made by SGC to or for the benefit of SSM, and that no payments would be made by or on behalf of SGC to any other person.[4] Concerning the latter representation, Stiffel failed to disclose a subsequent $100,000 fee from SGC to Stifel. The government urges that the representation and the failure to disclose carried with it the potential for harm because the fee could have jeopardized the tax exempt status of the bonds by increasing the yield. Although Illinois bond counsel testified generally that he relied upon the certifications by

---

[4]     The certification provided:

8.     To the best of my knowledge, no payments will be made by or on behalf of SGC to or for the benefit of SSMHC, other than as specified in the forward supply agreements being provided by SGC.

9.     Except as provided in paragraph 8, to the best of the Broker's knowledge, no payments will be made by or on behalf of SGC to any person.

Aplt. App. 4131. To the extent the government has argued that representation number 8 was violated, the testimony is completely to the contrary.

- 18 -

Stifel and SGC, id. at 2462, 2468, he also testified that additional payments by SGC could violate the arbitrage restrictions only if they were **to or for the benefit of SSM.**[5] Id. at 2466. According to some testimony, whether a fee generated on reinvestment proceeds was part of the yield was a question on which lawyers disagreed. Tr. 1028. Even assuming it was, there simply was no testimony indicating that a fee paid by SGC directly to Stifel for services rendered to SGC might somehow be considered as paid "to or for the benefit of SSM" for IRS aggregation of yield purposes, let alone testimony explaining

---

[5]    Q:    Why is it important to know about the fees?

    A:    Well, it's important to know about the fees because our view of the arbitrage regulations is that if there are fees that are paid for the benefit of SSM, even though they're not paid as consideration to SSM, but there are fees that are paid by Sakura Global Capital, they could be treated as being paid to SSM, in which case it would increase the amount that we treat as them [SSM] receiving from this forward supply agreement.

        For example, I mean, if Sakura Global Capital said, "We're going to pay $10,000 for your salaries or your overhead and we're going to give you $400,000 as consideration for this right to reinvest under the forward supply agreement, we would say they [SSM] really received $410,000, even though the forward supply agreement says that they only got $400,000.

    Q:    So the fees might be attributed to the issuer?

    A:    Be attributed to the issuer because they benefit the issuer.

Tr. 2460-61.

- 19 -

how this could be so.   In fact, bond counsel on redirect expressly declined to express an opinion on whether any payments were made which would contradict his certification of tax status of the issue.  Tr. 2478.

We are mindful that a scheme need not be completed to constitute wire fraud, United States v. Stewart, 872 F.2d 957, 960 (10th Cir. 1989), so the government was not required to prove that the tax exempt status of the interest was actually revoked.  That said, our responsibity to construe the evidence and its inferences in the light most favorable to the government does not allow us to supply missing evidence on complicated tax questions.  We cannot rely on the government's broad statement in its brief that all investment agreement fees were attributable to the issuers as a benefit, Aplee. Br. at 27, when it is not supported by the testimony and ignores the careful distinction made by bond counsel that the payments must be "to or for the benefit" of the issuer.  No evidence indicates that the representation that no payments will be made by SGC "to or for the benefit of SSM" was breached.  Though Stifel misrepresented that SGC would not pay an additional fee to Stifel for the forward supply contract, this information resulted in no actual or potential harm to SSM.  Nor did Stifel's instructions to SGC to bill its fee to the Mercer County account.  No evidence independent of the alleged scheme suggests in any way that Mr. Cochran sought to harm SSM or its bondholders.  See Sawyer, 85 F.3d at 725 (Although a public official may engage in reprehensible conduct related to his office, "the conviction of that official for honest-services fraud cannot stand where the conduct

does not actually deprive the public of its right to her honest services, and it is not shown to intend that result."). Moreover, we know not from this record how SSM would have changed its conduct had the disclosure been made. See Gray, 96 F.3d at 774-75. Thus, the wire fraud counts concerning the SSM transaction cannot stand.

Having determined that the wire fraud counts attributable to the OCAT and SSM transactions cannot stand for want of proof of criminal fraud, the remaining counts of conviction must be reversed. See Brown, 79 F.3d at 1562.

REVERSED.