**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 8 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff - Appellant,

v.

ROBERT M. COCHRAN,

      Defendant - Appellee,

JAMES V. PANNONE; STEVEN S.
STRAUSS; SAKURA GLOBAL,

      Defendants.

No. 99-6157

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 95-CV-1477)**

---

Eric Summergrad, Deputy Solicitor (Harvey J. Goldschmid, General Counsel;
Christopher Paik, Special Counsel; and Meyer Eisenberg, Deputy General
Counsel, with him on the briefs), Securities and Exchange Commission,
Washington, D.C., for the appellant.

Bernard J. Rothbaum (Drew Neville and Russell Cook with him on the brief),
Linn & Neville, P.C., Oklahoma City, OK, for the appellee.

---

Before **LUCERO**, **McKAY** and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

This securities fraud action arises from the alleged acts and omissions of an employee of a bond underwriter that occurred while he was advising governmental agencies regarding the issuance of bonds and the interim reinvestment of the proceeds from the bond issues. We must resolve two questions: first, whether the underwriter's employee owed those agencies a duty to disclose his alleged "rigging" of reinvestment contract bids and payments made by the recipients of the reinvestment contracts to the underwriter; and second, whether such undisclosed information would have been material to those agencies. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we hold that a duty to disclose can be premised on either federal or state law. Applying Oklahoma common law, we conclude that the evidence in the record is sufficient to create a genuine issue of material fact as to whether a relationship of trust and confidence giving rise to a duty to disclose existed between the defendant and the governmental agencies. We also conclude there is a genuine issue of material fact as to whether the payments and alleged bid-rigging would have been material to those agencies.

# I

This is the second chapter in the continuing saga of Robert M. Cochran's alleged overreaching in the course of municipal bond transactions. In the first installment, United States v. Cochran, 109 F.3d 660, 662-63 (10th Cir. 1997) (Cochran I), we reversed Cochran's criminal conviction, finding the evidence was insufficient to establish criminal liability for his role in different bond transactions than those at issue in this case. Once again we must determine if Cochran, Executive Vice President of the municipal bond underwriting firm Stifel, Nicolaus & Company, Inc. ("Stifel"), can be held liable for his conduct while acting as lead banker on bond transactions underwritten by Stifel. The two bond transactions in the instant case, however, were not the same ones underlying the charges in Cochran I. Furthermore we are presently confronted with a question of civil rather than criminal liability. Because we are reviewing the grant of Cochran's motion for summary judgment, the following facts are based on the record viewed in the light most favorable to the Securities and Exchange Commission. See Thournir v. Meyer, 909 F.2d 408, 409 (10th Cir. 1990).

The first transaction is a 1992 issue by the Oklahoma Turnpike Authority ("OTA") of approximately $608 million in tax-exempt bonds, the proceeds of which are to be used to retire previously-issued higher-yield tax-exempt bonds. In such a transaction, also referred to as an issuance of "advance refunding"

bonds, the proceeds of the new issue are used to purchase government securities placed in escrow until payments on the old bonds fall due.  Because of the size of the OTA issue, discrepancies between the maturity dates of the government securities held in escrow and the payment dates on the old bonds provided an opportunity to earn additional income.  To realize that potential income, the OTA decided to enter into a "forward purchase agreement" ("forward"), a financial instrument whereby an investor pays the issuer a fixed sum in return for the right to invest bond proceeds during the interim period between maturity and payment.  Cochran solicited bids for the forward and selected Sakura Global Capital, Inc. ("Sakura") as the winning bidder.  The record contains evidence sufficient to create a material issue of fact as to the SEC's allegation that Sakura's success was a foregone conclusion because Cochran rigged the bidding.  After Sakura's initial bid was accepted, the OTA authorized Cochran to restructure the escrow and renegotiate the terms of the forward accordingly.  Under the final terms of the forward, Sakura paid the OTA an up-front fee of $12.357 million.  Moreover, undisclosed to OTA, Sakura paid Stifel $6.593 million in relation to the transaction.

The second transaction involved in this appeal is a 1990 bond issue by the Pottawatomie County Development Authority ("PCDA").  Those bonds, valued at approximately $18 million, were ordinary revenue bonds, not advance refunding

- 4 -

bonds. The PCDA decided to use part of the proceeds from the issue to purchase a "guaranteed investment contract" ("GIC"), a financial instrument that guarentees a specific return on a specific date. A brokerage firm, Pacific Matrix, solicited bids for the GIC, and the contract ultimately was awarded to Banque Indosuez. In return for brokering the deal, Pacific Matrix received a fee of $109,025 from Banque Indosuez, 80% of which, $87,220, it paid to Stifel. There is evidence in the record supporting the allegation that the PCDA was unaware of the payment by Pacific Matrix to Stifel.

The SEC brought the instant civil enforcement action against Cochran and other parties involved in those bond issues.[1] With respect to Cochran, the SEC alleged that his failure to disclose to the OTA the rigged bidding for the forward purchase agreement and the payment from Sakura to Stifel, as well as his failure to disclose to the PCDA the payment from Pacific Matrix to Stifel, violated the antifraud provisions of federal security laws. Specifically, the SEC alleged Cochran violated the following statutes: Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77(q)(a); and, pursuant to Section 15B(c)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o-4(c)(1), Rule G-17 of the Municipal Securities Rulemaking Board. Cochran

---

[1] Cochran and the SEC are the only parties to this appeal.

moved for summary judgement, arguing he was under no duty to disclose either the payments Stifel received from Sakura and Pacific Matrix or his alleged bid-rigging, and in any event neither the payments nor the alleged bid-rigging placed the tax-exempt status of the bonds at risk and therefore the non-disclosures were not material.

In its order, the district court held Cochran did not owe the OTA or the PCDA a duty to disclose the payments or bid-rigging and therefore granted his motion for summary judgment. With respect to the OTA issue, it stated that the SEC "argues that 'OTA placed its trust and confidence in Cochran,' but fails to articulate any theory for how that fact gives rise to a duty on the part of Cochran personally." (Appellant's App. at 128 (citation omitted).) As for the PCDA issue, the court simply stated "[a]gain, plaintiff fails to articulate a theory for why Cochran had a personal duty to inform PCDA of the payment. Plaintiff has produced no facts evidencing a duty on behalf of Cochran to PCDA." (Id. at 129-30.) The district court also held there was a genuine issue of material fact as to whether the payment by Sakura to Stifel jeopardized the tax-exempt status of the OTA bonds and was therefore material, but declined to address the question of whether the payment by Pacific Matrix to Stifel jeopardized the tax-exempt status of the PCDA bonds.

**II**

We review the grant or denial of summary judgment de novo, applying the same standard of review as the district court.  See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  That standard is set forth in Fed. R. Civ. P. 56(c): Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law."

A failure to disclose is actionable as fraud under § 10(b) of the Securities Exchange Act of 1934 only if "one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"     United States v. Chiarella   , 445 U.S. 222, 228 (1980) (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).  Moreover, the undisclosed information must be material.     See Connet v. Justus Enter. of Kan., Inc., 68 F.3d 382, 385 (10th Cir. 1995).   [2]  Thus, the first question we must address is whether, viewing the record in the light most favorable to the SEC, a fiduciary or other similar relationship of trust and confidence existed between Cochran and

---

[2]  Materiality of the undisclosed information is also a prerequisite for liability for a fraudulent omission under 15 U.S.C. § 77q(a), see United States v. Yeaman, 194 F.3d 442, 451 (3d Cir. 1999), and, as applied to the facts of this case, for unfair dealing under Municipal Securities Dealers Rule G-17, cf. SEC v. Dain Rauscher, Inc., Fed. Sec. L. Rep. ¶ 90,665 (C.D. Cal. Aug. 18, 1999). Because the parties make no distinct arguments regarding these statutes and regulations, we do not consider them seperately.

the OTA and/or the PCDA so as to give rise to a duty to disclose the payments and bid-rigging. If such a duty existed, we must then address Cochran's alternative argument that the undisclosed facts were not material.

**A**

Although this Circuit has discussed or applied Chiarrella's duty to disclose requirement on several occasions, we have never expressly determined what body of law controls our analysis of whether a fiduciary or similar relationship of trust and confidence giving rise to a duty to disclose exists. To resolve this threshold issue, we turn first to Chiarrella. In concluding that the failure to disclose violates § 10(b) only if a relationship of trust and confidence giving rise to such a duty exists, the Court expressly rejected the argument that § 10(b) itself imposed a duty to disclose material nonpublic information. See Chiarrella 445 U.S. at 233-35. Rather, Chiarrella relied on the common law rule embodied in Restatement (Second) Torts § 551(2)(a) to determine whether the requisite relationship and duty was present. See id. at 228-29 & n.9. Interpreting Chiarrella's duty to disclose analysis, the Fourth Circuit held that "the duty to disclose material facts arises only when there is some basis outside the securities laws, such as state law, for finding a fiduciary or other confidential relationship." Fortson v. Winstead, McGuire, Sechrest & Minick, 961 F.2d 469, 472 (4th Cir. 1992) (citing Windon Third Oil & Gas Drilling Partnership v. FDIC, 805 F.2d

342, 347 (10th Cir. 1986); Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 496 (7th Cir. 1986)). The Eighth Circuit has adopted the position that a fiduciary relationship and concomitant duty to disclose may be established by state or federal law, or, absent such a basis, upon a finding by the court that the nature of the parties' relationship and other enumerated factors warrant the imposition of such a duty. See Camp v. Dema, 948 F.2d 455, 460 (8th Cir. 1991). We agree with the Eighth Circuit to the extent that a duty to disclose under § 10(b) may be present if either a federal statute (other that § 10(b) itself) or state statutory or common law recognizes a fiduciary or similar relationship of trust and confidence giving rise to such a duty between the defendant and the plaintiff. We express no view as to whether there might be additional sources for such a duty, such as professional rules of conduct or federal common law.

Because Oklahoma was the locus of Cochran's relationships with the OTA and the PCDA, we first consider the law of that state. Under Oklahoma law, fiduciary relationships are not limited to any specific legal relationship but can arise "anytime the facts and circumstances surrounding a relationship 'would allow a reasonably prudent person to repose confidence in another person.'" Devery Implement Co. v. J.I. Case Co., 944 F.2d 724, 730 (10th Cir. 1991) (quoting In re Estate of Beal, 769 P.2d 150, 155 (Okla. 1989)). Put another way, a fiduciary relationship "does not rest on any particular relationship" but rather

"springs from an attitude of trust and confidence and is based on some form of agreement, either expressed or implied, from which it can be said the minds have been met to create a mutual obligation." Lowrance v. Patton , 710 P.2d 108, 112 (Okla. 1985) (footnote and citations omitted). A fiduciary relationship gives rise to a duty to fully disclose material facts. See Barry v. Orahood , 132 P.2d 645, 648 (Okla. 1943). Even absent a fiduciary relationship, "[t]he relation of the parties, the nature of the subject matter of the contract or the peculiar circumstances of each particular case, may be such as to impose a legal or equitable duty to disclose all material facts." Id. (citing Hays v. Meyers , 107 S.W. 287 (Ky. 1908)). When one party expressly or implicitly agrees to act as an agent or broker on behalf of another party, Oklahoma law imposes on the agent a fiduciary duty to disclose to the principal all material facts within the scope of the agency. See Irby v. Lee , 512 P.2d 253, 255 (Okla. Ct. App. 1973) (quoting favorably 12 Am. Jur. Brokers § 89: "The rule requiring a broker to act with the utmost good faith toward his principal places him under a legal obligation to make a full [sic] fair, and prompt disclosure to his employer of all facts within his knowledge which are or might be material to the matter in connection with which he is employed.").

The SEC points to evidence in the record that is sufficient to create a genuine issue of fact as to whether Cochran had a fiduciary relationship with the OTA and the PCDA under Oklahoma law.

1.    The PCDA

The chairman of the PCDA submitted an affidavit stating that Cochran advised the agency to invest certain bond proceeds in a GIC and that the agency authorized Cochran to act on its behalf.  The chairman had no previous exposure to GIC's, but based on the trust and confidence he placed in Cochran, he "instructed Cochran to proceed on the PCDA's behalf with the selection and purchase of a GIC for the PCDA."  (Appellant's App. at 228-29.)  All of these events occurred while Stifel was acting as underwriter and Cochran was acting as lead banker of the bond issue.  Taken as true, these facts establish the PCDA reposed trust and confidence in Cochran based on the nature of the parties' past dealings and the PCDA's inexperience with GICs, Cochran welcomed that reliance, and he agreed to purchase a GIC as the PCDA's agent while still acting as lead banker for the underwriter of the bond issue the proceeds of which were used to make the purchase.  Although there is no explicit evidence of Cochran's consent to act as the PCDA's fiduciary in obtaining a GIC, the record supports an inference that Cochran assented by acting as an advisor and agent in the GIC transaction.  Based on that evidence, a reasonable juror could conclude that, under

Oklahoma law, a relationship of trust and confidence existed between Cochran and the PCDA that gave rise to a duty to disclose all material facts related to the purchase of the GIC. Cf. SEC v. Rauscher Pierce Refsnes, Inc., 17 F. Supp.2d 985, 992-95 (D. Ariz. 1998) (holding that the SEC had adequately pleaded a duty to disclose based on allegations that the defendant had advised a state agency to issue securities and invest the proceeds in an escrow account, prepared the necessary documentation, and sold the agency the escrow securities at a marked-up price, all with the knowledge that the agency was inexperienced and relying heavily on its advice).

2. The OTA

The evidence concerning the relationship between Cochran and the OTA is also sufficient to create a genuine issue of material fact as to the existence of a duty to disclose under Oklahoma law. The chief executive officer of the OTA testified that the agency relied on Cochran both to sell the bonds and to obtain bidders for the forward. Corroborating that broad statement, there is evidence that Cochran played an active role in, and had substantial control over, the bidding process. Furthermore, the agency's chief financial officer testified that Cochran restructured the initial escrow provisions of the forward and renegotiated the amount of Sakura's payment on behalf of the OTA. More generally, the record testimony suggests that the OTA often relied on Cochran to perform the

functions of the chief financial officer.  Thus, the evidence viewed in the light most favorable to the SEC supports an inference that the OTA reposed substantial trust and confidence in Cochran and that the parties mutually agreed Cochran would act as the OTA's agent in soliciting bids for, and negotiating the terms of, the forward.  A reasonable jury could find such a relationship gives rise under Oklahoma law to a duty to disclose material facts related to the forward. [3] Cf. Rauscher , 17 F. Supp.2d at 992-95.

3.    Cochran I

Our holding on the duty to disclose is not controlled by or contrary to the conclusion in  Cochran I , 109 F.3d at 665-67, that no fiduciary relationship existed between Cochran and a different state agency during the reinvestment phase of a different bond issue.  The holding in     Cochran I  relied on a substantially different factual record.  Perhaps most significantly, in     Cochran I , 109 F.3d at 666, the Oklahoma City Airport Trust's director "admitted that neither Mr. Cochran nor

_____

[3] We conclude there is a genuine issue of material fact as to whether Cochran himself had a direct fiduciary or similar relationship of trust and confidence with the OTA and the PCDA giving rise to a duty to disclose.  Under Oklahoma law, an individual employed by a company can be held personally liable for breaching a fiduciary duty to her clients.  See Douglas v. Steele, 816 P.2d 586, 589-90 (Okla. Ct. App. 1991) (holding that a travel agent was a special agent of the travelers, and therefore personally liable for losses related to her services, despite the agent's assertion that she was acting on behalf of a travel agency and/or tour operator).  Therefore, we need not consider whether any such duty could be premised on the relationship between Stifel and the agencies.

- 13 -

his codefendants had a fiduciary relationship with [the Trust] during the reinvestment stage." By contrast, in the present case officials with both the PCDA and the OTA testified that Cochran acted not merely as an underwriter but also as the agencies' advisor and agent during the reinvestment phase.

**B**

Cochran argues that even if he owed a duty to disclose material facts to the OTA and the PCDA we should affirm on the alternative ground that his alleged bid-rigging and the payments to Stifel were not material. "We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied on by the district court." United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994). As a general rule, however, we do not consider issues not passed on below, and it is appropriate to remand the case to the district court to first address an issue. See R. Eric Peterson Constr. Co. v. Quintek, Inc., 951 F.2d 1175, 1182 (10th Cir. 1991). In its order granting summary judgment to Cochran, the district court expressly held that a genuine issue of material fact exists as to whether the actions of Cochran and his codefendants jeopardized the tax-exempt status of the OTA bonds and, consequently, whether information concerning such actions would have been material to the OTA. We first review that holding. Although in

- 14 -

general materiality is primarily a factual inquiry, "the question of materiality is to be resolved as a matter of law when the information is 'so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality.'" Connett, 68 F.3d 384 (quoting Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir. 1991)).

Information is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Id. at 385 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Cochran concedes, at least for the sake of argument on appeal, that the payment from Sakura to Stifel would be material under that definition if it had some bearing on the tax-exempt status of the OTA bond issue. He instead argues there is no evidence in the record tending to demonstrate that the bid-rigging and payments would affect the bonds' tax-exempt status and, to the extent the record does contain such evidence, it is incorrect as a matter of law.

To understand how the payment by Sakura to Stifel and Cochran's alleged bid-rigging might or might not affect the tax-exempt status of the OTA bonds, we must briefly delve into the intricacies of bond taxation. Our starting point is straightforward enough: Interest earned on state or municipal bonds is generally tax exempt. See 26 U.S.C. § 103(a). This exemption does not apply, however, to

arbitrage bonds.    See 26 U.S.C. § 103(b)(2).  An arbitrage bond is defined, in

relevant part, as "any bond issued as part of an issue any portion of the proceeds

of which are reasonably expected (at the time of issuance of the bond) to be used

directly or indirectly . . . to acquire higher yielding investments."  26 U.S.C.

§ 148(a).  "Higher yielding investments," in turn, "means any investment property

which produces a yield over the term of the issue which is materially higher than

the yield on the issue."  26 U.S.C. § 148(b)(1).  A bond will be treated as an

arbitrage bond under two scenarios: if the issuer reasonably expects to acquire or

intentionally acquires a higher yielding investment with proceeds from the bond

issue,  see 26 U.S.C. § 148(a); or if the issuer fails to rebate to the government

"the amount earned on all nonpurpose investments" in excess of "the amount

which would have been earned if such nonpurpose investments were invested at a

rate equal to the yield on the [bond] issue,"      26 U.S.C. § 148(f)(2).  A

"nonpurpose investment" is an investment "acquired with the gross proceeds of

the bond issue, and . . . is not acquired in order to carry out the governmental

purpose of the issue."    See 26 U.S.C. § 148(f)(6)(A).

Having set out the relevant statutory framework, we need not inquire

further into the interpretation of 26 U.S.C. § 148, the regulations thereunder, and

their application to the facts of this case in order to determine whether the SEC

has presented sufficient evidence of materiality to withstand Cochran's motion

for summary judgment. The district court found that "[p]laintiff has produced sufficient evidence to present material questions of fact as to whether the fair market value of the forward was $12.357 million [or $18.95 million, the sum of the amounts paid by Sakura to Stifel and the OTA]." (Appellant's App. at 125.) It further reasoned, based on the record, that the forward's fair market value might be material because, if the forward's actual value was $18.95 million, the payment made to Stifel could be deemed an impermissible diversion of arbitrage profits constructively received by the OTA and thereby endanger the tax-exempt status of the bonds pursuant to the applicable arbitrage bond regulation, Treasury Regulation § 1.103-13 (1979).

We agree with the district court that the record evidence creates a genuine dispute of material fact as to the actual fair market value of the forward. We also conclude that information implicating the fair market value would be material to a reasonable investor . See Connett , 68 F.3d at 384-85. One of the OTA's bond counsel testified that his understanding was that "the Treasury Regulations in effect at that time indicated that investments should be purchased at fair market value," (Appellant's App. at 214), presumably to avoid impermissible "deflection of arbitrage," ( id. at 215). Counsel further testified that his office recommended, and apparently the OTA agreed, that the fair market value be established by securing the forward through a process of disinterested bidding. The alleged bid-

rigging by Cochran, which is sufficiently supported by record evidence to create a material dispute of fact for summary judgment purposes, seems particularly relevant to whether or not the recommended process of disinterested bidding was followed. Moreover, one of Sakura's experts testified that he "would be very concerned about diversion of arbitrage" profits if, hypothetically, a financial institution offered to pay an issuer $19 million for a forward, but, on the urging of an agent of the issuer who was negotiating the transaction, ultimately paid only $10 million. (Appellant's Reply Br. Ex. A at 71).

Based on that record evidence, we cannot agree that the payment to Stifel and the alleged bid-rigging were immaterial as a matter of law. The record supports the conclusion that fair market value and disinterested bidding were important to the OTA's bond counsel for purposes of avoiding potential arbitrage violations, which in turn supports the inference that disclosure of the payment and bid-rigging would have influenced the bond counsel's recommendation to the OTA based on the tax consequences of the transaction, and thereby influenced the OTA's investment decision. Moreover, there is no evidence in the record that the bond counsel's position is unreasonable; rather, the testimony of Sakura's expert corroborates that position. Thus, there is sufficient evidence to support a factual finding of materiality because a juror could reasonably conclude the payment and alleged bid-rigging "would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available." Connett, 68 F.3d at 385 (quotations and citation omitted).

As with the duty to disclose, Cochran I does not preclude this conclusion. Contrary to Cochran's urging, that opinion clearly does not stand for the proposition that the failure to disclose a fee similar to the one at bar is never material as a matter of law. Rather, our holding in Cochran I, like our holding here, was based on the peculiar facts before the court. In that case, the only evidence as to the manner in which an undisclosed payment could amount to fraud under 18 U.S.C. § 1346 came from an expert who testified that the undisclosed payments "could violate the arbitrage restrictions only if they were to or for the benefit of [the bond issuer]." Cochran I, 109 F.3d at 668. We did not adopt that position as a correct statement of the law. Instead, relying on that testimony as the only evidence in the record concerning the application of the arbitrage provisions to the facts of the case, we concluded "there simply was no testimony indicating that a fee paid by [the provider of the forward] directly to Stifel for services rendered to [the provider of the forward] might somehow be considered as paid 'to or for the benefit of [the issuer]' for [Internal Revenue Service] aggregation of yield purposes, let alone testimony explaining how this could be so." Id. at 669. Our conclusion in that case also rested on the lack of evidence concerning the way in which disclosure of the fee would have changed the

issuer's conduct.  <u>See</u> <u>id.</u>  In the instant case, by contrast, there is testimony      that the undisclosed bid-rigging and fee could impact the yield of the forward, not because the fee was paid to or for the benefit of the OTA, but because those events could alter the fair market value of the forward, and the calculation of arbitrage profits is based on the fair market value of such an investment.      The evidence in this case could support an inference that, had the bid-rigging and payment been disclosed, the OTA would not have invested in the forward based on the bond counsel's advice concerning the transaction's potential adverse tax consequences.

We need not, and do not, decide whether, as a matter of law, the payment at issue <u>actually</u> endangered the tax-exempt status of the OTA bond issue, either by affecting the forward's fair market value or otherwise.  Those questions are not appropriate for resolution in this proceeding, and particularly inappropriate for resolution without the involvement of the IRS and the benefit of its interpretation of its own regulations.  In addition, the materiality of the undisclosed information hinges on the way that information would have been viewed by a reasonable investor, not on the way it is ultimately viewed by the IRS.  Where, as here, the tax consequences of Cochran's bid-rigging and Sakura's payment to Stifel are uncertain,      and the potential tax implications are significant, it is certainly reasonable for an issuer/investor to err on the side of

caution by avoiding any investment that might result in arbitrage profits.  As in Cochran I , 109 F.3d 669, we decline to speculate on "complicated tax questions" not before this Court, particularly without the benefit of the views of the IRS, and express no opinion on the actual impact of the bid-rigging and payment at issue on the status of the OTA bonds under the arbitrage bonds regulations.

We also decline to determine whether there is a material question of fact with respect to the materiality of the payment in the PCDA transaction, an issue the district court did not reach below.  The two transactions are sufficiently different that we deem it prudent to permit the district court to address that issue in the first instance.

### III

The judgment of the district court is **REVERSED** .  This case is **REMANDED** for further proceedings consistent with this opinion.