**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 28, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CHARLES HOMER "CHIP" SHARP,

      Defendant-Appellant.

_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MICHAEL ARTHUR GRIGGS,

      Defendant-Appellant.

No. 13-1114

No. 13-1117

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:08-CR-00365-MSK)**

Robert T. Fishman, Of Counsel, Ridley, McGreevy & Winocur, PC, Denver, Colorado, for Defendant-Appellant, Charles Sharp.

Norman R. Mueller, (Rachel A. Bellis, with him on the briefs), of Haddon, Morgan and Foreman, P.C., Denver, Colorado, for Defendant-Appellant, Michael Griggs.

Pegeen D. Rhyne, Assistant United States Attorney, (John F. Walsh, United States Attorney, with her on the consolidated brief), Denver, Colorado, for Plaintiff-Appellee.

Before **BRISCOE,** Chief Judge, **HOLLOWAY\*** and **PHILLIPS**, Circuit Judges.

_____

**BRISCOE**, Chief Judge.

_____

Codefendants Michael Griggs and Charles Sharp appeal from their convictions for mail fraud and conspiracy to commit mail fraud. Griggs also challenges a $500,000 fine that was imposed by the district court as part of his sentence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

_____

\*The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, fully participated in these appeals and drafted the combined concurrence and dissent included with this decision. The decision was circulated to the full court prior to his death. Judge Holloway passed away, however, before the opinion and his separate writing could be filed and published. "The practice of this Court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." _United States v. Wiles_, 106 F.3d 1516, 1516 n.\* (10th Cir.1997); _see also_ 28 U.S.C. § 46(d) (noting circuit court may adopt procedures permitting disposition of an appeal where remaining quorum of panel agrees on the disposition). The remaining panel members have acted as a quorum with respect to this opinion and no judge of this Court has objected to publication.

I

*A. Factual background*

*1. The defendants and their operation of DRI*

In 1986, defendant Griggs formed Disaster Restoration, Inc. (DRI), a Denver, Colorado-based corporation, and subsequently served as its owner and chief executive officer. DRI repaired and restored commercial and residential properties throughout Colorado that were damaged by fire, flood, or other disasters. DRI had four divisions, each of which engaged in a separate part of the restoration process: (1) the emergency services division, which responded immediately to disasters; (2) the contents division, which both moved and restored personal property; (3) the structural repair division, which performed needed structural repairs on the damaged commercial and residential buildings; and (4) the environmental division, which addressed environmental concerns arising out of a disaster. Approximately 85% of DRI's restoration work was performed by its own employees; the remaining 15% was performed by subcontractors hired by DRI.

In carrying out its business, DRI contracted directly with the owner of the damaged property. DRI would often, in turn, work directly with and be paid by the property owner's insurance company. In doing so, DRI would submit to the insurance company an estimate outlining the scope and proposed cost of the

3

repair and restoration work that was to be performed. In preparing these estimates, DRI used Xactimate, a software program commonly utilized by insurance adjusters to calculate repair and construction costs. DRI's estimates also sometimes included manually-input line items relating to work to be performed by its subcontractors. Those line items referenced the name of the subcontractor and typically included the words "per invoice" or "per proposal."

In 2003, Griggs hired defendant Sharp to work as the chief executive officer and operating manager of DRI. Both Griggs and Sharp established company policies, and also trained and supervised DRI project managers and estimators.

Beginning in approximately 2004, Griggs and Sharp began instructing DRI employees who prepared DRI's estimates to add 20-30% to the price that DRI's subcontractors were charging DRI. As a result, the estimate sent by DRI to an insurance company would, in the case of a line item relating to subcontractor work, list an amount 20-30% higher than the subcontractor's bid for the work (and that DRI knew it would be paying the subcontractor for its work). Griggs and Sharp also instructed DRI employees to require DRI's subcontractors to provide DRI with two invoices: one that listed the actual amount the subcontractor would charge and receive from DRI, and a second invoice that listed a total amount 20-30% higher than the first invoice. The invoices reflecting the actual charges to DRI went to DRI's accounts payable department for payment

4

and were not shared with the insurance companies. The inflated invoices were kept in DRI's job files to be provided to insurance adjusters upon request. Thus, the sole purpose for the inflated invoice was to provide DRI with a document that would support the amount listed on the subcontractor line item of DRI's estimate.

On most DRI estimates, DRI employees also added 10% for overhead and 10% for profit, a total of 20% markup that was known and generally agreed to by insurers and was standard in the industry.

### 2. *The individual jobs at issue*

The counts of conviction at issue in these appeals stem from the following restoration jobs performed by DRI between 2005 and 2006.

### *a. The Belterra job (basis for Count 4)*

In 2005, DRI performed restoration work on a property in Longmont, Colorado, owned by Belterra Inc. and insured by Travelers Insurance (Travelers). DRI employee Mark Troudt provided Travelers with a revised estimate that included two subcontractor line items: one in the amount of $62,430.01 for "ELECTRICAL" and another in the amount of $1,976.10 for "PLUMBING." Supp. ROA at 32. The line item for the electrical work stated "[t]he line item above represents the electrical repairs per detailed invoices from Master Electrician (A/C Electric)." Id. The line item for the plumbing work stated that the amount listed was "per the detailed break down [sic] from D&H Plumbing and Heating." Id. In fact, however, DRI paid only $45,486.96 to its subcontractor for

5

the electrical work and $1,580.88 to its subcontractor for the plumbing work.

### b. The Benaglio job (basis for Counts 7 and 8)

In 2005, DRI performed restoration work on a property in Broomfield, Colorado, owned by John Benaglio and insured by The Hartford Insurance Company (The Hartford). Troudt sent The Hartford a DRI estimate that included seven line items for vinyl windows that included the following language: "The line item above represents the actual cost of the window for installation and material per the invoice from Professional Window Service." Id. at 79, 83, 88, 91, 93, 94, 96. These seven line items in DRI's estimate totaled $4,084.72. But DRI paid its subcontractor, Professional Window Service, only $3,568.44 for the work.

On this same DRI estimate, Troudt also listed three subcontractor line items for "ELECTRICAL" work. Id. at 108-09. Each of these line items stated that the amounts were "[p]er invoice from Ruby Electric." Id. However, DRI actually paid Ruby Electric 20% less for each line item than was listed on its estimate to The Hartford.

### c. The Cahall job (basis for Count 15)

In 2005, DRI performed restoration work on a property in Broomfield, Colorado, owned by Rosemary Cahall and insured by the Kemper Insurance Company (Kemper). DRI employee Justin Blackburn submitted to Kemper a DRI estimate that included two subcontractor line items, one in the

6

amount of $8,009 and the other in the amount of $5,550, for work performed by subcontractor D&H.  Id. at 184-85.  Each of these line items included the wording "per estimate from D&H Heating and Air."  Id.  DRI, however, paid D&H only $6,407 for this work.

On the same DRI estimate, Blackburn also listed a subcontractor line item for "Electrical repairs - per estimate from H&H Electrical" in the amount of $4,180.  Id. at 184.  The actual work, however, was performed by Ruby Electric and DRI paid Ruby Electric only $2,686.40 for the work.

*d. The Clear Creek job (basis for Counts 16 and 17)*

In 2005, DRI performed restoration work on a property in Empire, Colorado, owned by Clear Creek Investments and insured by State Farm Insurance Company (State Farm).  Troudt sent State Farm a DRI estimate that listed a single subcontractor line item in the amount of $6,231.90 for "HEAT, VENT & PLUMBING" work performed by D&H.  Id. at 226.  Written below the line item was the phrase "per the the [sic] invoice and breakdown from D&H Heating in the amount of 5193.25 x contractor overhead and profit of 20% = the cost of $6231.90."  Id.  Troudt also sent a cover letter that stated, in pertinent part, "The break down [sic] is per invoice received from D&H Heating for labor and material completed to date."  Id. at 225.  In fact, however, D&H had agreed to perform the work for $3,879.60 and invoiced DRI for that amount.

*e. The Evans job (basis for Counts 22 and 23)*

7

In 2005, DRI performed restoration work on a property in Boulder, Colorado, owned by Kent and Marilyn Evans and insured by State Farm. DRI employee Jason Cain sent State Farm a DRI estimate that included a subcontractor line item in the amount of $267.52 for "Electronics Cleaning per RescueTech." Id. at 336. Included with the line item was the following statement: "Electronics cleaning includes 20% O&P." Id. Rescue Tech provided DRI with an estimate in the amount of $223.03, but ultimately agreed to accept $178.42 from DRI for the work.

Cain also sent State Farm a DRI supplemental estimate that included subcontractor line items in the amount of $3,550 for "PAINTING . . . Per CertaPro Painting," id. at 347, and in the amount of $5,899.85 for "CONCRETE - garage slab," id. at 348. Along with the supplemental estimate, Cain sent State Farm the false proposals from these subcontractors that matched the dollar figures listed on the supplemental estimate. In fact, however, CertaPro charged DRI $1,760, and TBD (the subcontractor that performed the concrete work) charged DRI $4,719.88.[1]

---

[1] Cain's supplemental estimate also included a subcontractor line item for "Electrical Rewire - per proposal from Ruby Electric" in the amount of $1,678.63. Supp. ROA at 348. According to the government, Ruby Electric actually charged DRI less than this amount. Unfortunately, however, the exhibits included in the record on appeal do not fully substantiate the government's assertion on this point, and thus we do not rely on it for purposes of our analysis.

Relatedly, we note that the exhibits included in the record suggest, but do

(continued...)

8

*f. The Jones job (basis for Count 30)*

In 2006, DRI performed restoration work on a property in Boulder, Colorado, owned by David Jones and insured by American Family Insurance (American Family). Blackburn sent American Family a DRI estimate that contained two subcontractor line items: one in the amount of $4,995.98 for "Plumbing repairs - per invoice from Broomhall Brothers Plumbing," and another in the amount of $4,456 for "Electrical repairs - per invoice from Ruby Electrical." Id. at 710. In fact, however, DRI paid both of these subcontractors 20% less than the amounts listed on DRI's estimate.

*g. The Justen job (basis for Count 31)*

In 2005, DRI performed restoration work on a property in Lakewood, Colorado, owned by Kathleen Justen and insured by Amica Insurance (Amica). Blackburn sent Amica a DRI estimate with a subcontractor line item in the amount of $5,700 for "Asbestos abatement - per estimate from Rocky Mountain Abatement." Id. at 739. Together with the DRI estimate, Blackburn sent Amica a proposal from Rocky Mountain that listed a contract price of $5,750. However, DRI actually paid Rocky Mountain $4,025 for the work.

*h. The List job (basis for Count 36)*

_____

[1](...continued)
not fully establish, that DRI's estimate and supplemental estimate included a total of $3,375 in subcontractor line items from Ruby Electric, and that DRI actually paid Ruby Electric a total of $2,700 for its work. Id. at 354, 356.

9

In 2005, DRI performed restoration work on a property in Niwot, Colorado, owned by Don List and insured by Allstate Insurance Company (Allstate). Blackburn sent Allstate a DRI estimate that included a subcontractor line item in the amount of $8,551.22 for "Electronics cleaning - per invoice from ICC Technical Loss Consultants of $7,126.02 plus ten and ten." Id. at 779. ICC provided DRI with an inflated invoice that matched the $7,126.02 figure. But DRI actually paid ICC $5,700.60 for the work.

### i. The Lusman job (basis for Count 37)

In 2006, DRI performed restoration work on a property in Morrison, Colorado, owned by Charles Lusman and insured by Sentry Insurance (Sentry). Blackburn sent to James Lynch, an independent adjuster who was working for Sentry, a falsely inflated Rocky Mountain Abatement proposal for $4,038 plus a $450 inspection fee. Id. at 803-05. Lynch relied on the false Rocky Mountain Abatement proposal and incorporated it as a line item in the claim estimate that he created for Sentry on the Lusman job. Unbeknownst to Lynch and Sentry, Rocky Mountain Abatement had agreed to perform the work for $3,250 plus a $450 inspection fee.

### j. The Taddonio job (basis for Count 53)

In 2005, DRI performed restoration work on a property in Lakewood, Colorado, owned by Louise Taddonio and insured by Ohio Casualty. Id. at 1047. Blackburn sent Ohio Casualty a DRI estimate that included a subcontractor line

10

item in the amount of $4,293.44 for "Motorized shades - per proposal from Ananda and Suns." Id. at 1048. Ananda and Suns provided DRI with two invoices: one in the amount of $4,293.44, and another in the amount of $3,484.32. Id. at 1055-56. DRI provided Ohio Casualty with a copy of the higher invoice, but actually paid Ananda and Suns the lower of these two amounts.

## B. Procedural background

On September 8, 2008, a federal grand jury returned a sixty-count indictment against Griggs, Sharp, and eight other DRI employees. Count 1 charged Griggs, Sharp, and the other defendants with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371. Counts 2 through 57 charged Griggs, Sharp and various other defendants with individual counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2. Counts 58 and 59 charged Sharp with extortion, in violation of 18 U.S.C. § 1951. Count 60 was a forfeiture charge against all of the defendants.

Four of the named defendants — Jason Cain, Brett Harding, Peter Jennings and Garland Scott Risdon — pleaded guilty. The government dismissed all charges against defendants Matthew Kaskel and Mark Troudt, as well as certain of the charges against Griggs, Sharp (in particular the extortion counts) and the remaining two defendants, Justin Blackburn and Daniel Travers.

The joint trial of Griggs, Sharp, Blackburn and Travers began in early July 2012. Following approximately five weeks of evidence and

11

approximately one week of deliberations, the jury returned a partial verdict, convicting Sharp and Griggs of several counts. Specifically, the jury convicted Sharp on Counts 1 (conspiracy), 4, 15, 22, 23, 30, 31, 36, 37, and 53, and convicted Griggs on Counts 1, 4, 7, 8, 15, 16, 17, 22, 23, 30, 31, 36, 37, and 53. As for Blackburn and Travers, the jury either acquitted them or was unable to reach a verdict on certain of the counts. Consequently, neither Blackburn nor Travers were found guilty on any count. Following the trial, the district court, acting pursuant to the government's motion, dismissed all of the counts on which the jury was unable to reach verdicts.

The district court sentenced Griggs to a term of imprisonment of fifty months, to be followed by a three-year-term of supervised release. The district court also ordered Griggs to pay restitution in the amount of $477,643.49, plus a fine of $500,000.

The district court sentenced Sharp to a term of imprisonment of thirty-six months, to be followed by a three-year-term of supervised release. The district court also ordered Sharp to pay restitution in the amount of $477,643.49.

II

*A. Sharp's Appeal*

Sharp raises five issues in his appeal: two sufficiency-of-the-evidence issues, two instruction-related issues, and, lastly, a challenge to his convictions based upon this court's decision in United States v. Cochran, 109

F.3d 660 (10th Cir. 1997). We conclude, for the reasons we shall discuss in greater detail below, that all of these issues lack merit.

> *1. Was the evidence presented at trial sufficient to establish that Sharp obtained money by false pretenses or representations?*

Sharp argues in his first issue on appeal that his convictions for mail fraud and conspiracy to commit mail fraud must be reversed because the evidence presented by the government at trial was insufficient to establish that he obtained money by false pretenses or representations. "We review the sufficiency of evidence de novo." United States v. Serrato, 742 F.3d 461, 472 (10th Cir. 2014). "The question for the court is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

The district court in this case instructed the jury that to find the defendants guilty of mail fraud, the government had to establish beyond a reasonable doubt each of the following elements:

> 1. That the named defendant devised or participated in a scheme to defraud or to obtain money or property by means of false pretenses or representations as that scheme is described in the Indictment.
>
> 2. That the named defendant acted with the specific intent to defraud or to obtain money or property by false pretenses or representations.

13

3. That the scheme involved a person making false pretenses or representations that were material, and

4. That the named defendant knew or could have reasonably foreseen that a person would use the mails or an interstate private or commercial carrier to transmit documents relating to the scheme as set forth in the Indictment.

ROA at 3064 (Instruction No. 25); see United States v. Schuler, 458 F.3d 1148, 1152 (10th Cir. 2006) (outlining essential elements of mail fraud claim under 18 U.S.C. § 1341). The district court further instructed the jury as to the meaning of a false pretense or representation:

A representation or pretense is false if it is known to be untrue or it is made with reckless indifference to its truth or falsity. A representation or pretense can also be false if it is a half-truth or omits or conceals a material fact if it is made with the intent to defraud.

ROA at 3066 (Instruction No. 28).

As Sharp notes, "[t]he most common type of statement relied upon by the government was a subcontractor line item consisting of a dollar figure and some additional statement like, 'per estimate from . . .' or 'per invoice from . . .' the subcontractor." Sharp Br. at 14. Sharp argues that, "[a]s a matter of law, none of these statements [we]re false." Id. at 15. To begin with, he argues, "[a] number standing alone cannot constitute a false statement: it makes no sense to say that '$4,000' is something that is 'true' or 'false.'" Id. "Nor," he argues, "can any of these statements be considered false simply because the dollar amount

14

was accompanied by an explanation that the figure was 'per invoice,' 'per estimate,' or some similar phrase." Id. "[I]n order for the jury to have properly concluded that a line item was false," Sharp argues, "it was required to conclude beyond a reasonable doubt that DRI represented that line item to be, not only the price that DRI proposed to charge the insurance companies for the subcontractor's work, but also that the line item stated the amount of money that DRI was going to pay its subcontractor to perform that work." Id. But, he asserts, "[n]othing in either the DRI estimate or the subcontractor's underlying invoice stated or implied that the price being charged by DRI was the same as the amount that DRI would pay the subcontractor for its work." Id. at 16. That is because, Sharp argues, "the purpose of a DRI estimate was to define the scope of work to be performed and to provide a basis for negotiating a fair and reasonable price for that work, . . . not to disclose DRI's arrangements with subcontractors, what it pays laborers, or the costs of material that DRI uses." Id.

Sharp argues that "[t]he same holds true with respect to the statements at issue in Counts 22 and 36 (relating to the Evans and List jobs), where DRI's estimates included line item prices for subcontractor work accompanied by statements that the number was 'per invoice' or 'per estimate' provided by the subcontractor and included 'ten and ten' or 20% O&P.'" Id. (quoting Exhibits 336 and 779). "With respect to both of these Counts," Sharp asserts, "DRI provided the insurance companies with a proposed price for

15

subcontractor work without representing that that price was identical to what DRI would in turn pay the subcontractor." Id. More specifically, Sharp asserts that "[t]he disclosure that the contractor's price was increased by '10+10' or by 20% does not constitute a representation that the line item price itself includes no markup, and that the only markup is the '10+10' or 20% referenced in the estimate." Id. at 16-17.

The government argues in response that "[a] rational jury could . . . have found that the subcontractor line items within the DRI estimates were themselves affirmative false representations." Gov't Br. at 23. In support, the government asserts that "[f]or each count of conviction, the relevant DRI estimate had language in the subcontractor line items that, in addition to the context of the estimate itself, caused the line item to be a false representation regarding what the subcontractor was charging DRI." Id. Specifically, "[l]ine items on each of these DRI estimates included one of the following references to the subcontractor documents: 'per detailed breakdown,' 'per invoice,' 'actual cost . . . per invoice,' 'per estimate,' 'per Rescue Tech Electronics,' 'per CertaPro Painting,' and 'per proposal.'" Id. (quoting various trial exhibits). "Additionally," the government argues, "the insurance adjusters testified that they understood the listed prices on the subcontractor line items to be what the subcontractors were charging DRI." Id. "The evidence," the government asserts, "supports the inference that [Sharp and Griggs] knew this and that this was precisely the reason they required DRI

16

employees to obtain the falsely inflated invoices/proposals from subcontractors." Id. "Unless [Sharp and Griggs] intended to deceive the insurance companies regarding what the subcontractors were charging DRI, there would have been no need to obtain the false subcontractor invoices/proposals." Id. And, the government asserts, "Sharp's statement to DRI employees in 2005 that 'if the insurance companies found out what we're doing, our life would end as we know it' is powerful evidence that [Sharp and Griggs intended to deceive the insurance companies." Id. at 23-24.

In any event, the government argues, it is clear that the false subcontractor invoices/proposals requested by DRI employees at the direction of Sharp and Griggs "were kept in DRI's job files to be provided to insurance adjustors [sic] 'upon request.'" Id. at 21 (quoting ROA at 306, 2981-82, 3003-04). "While these false subcontractor invoices/proposals were not always provided to insurance companies," the government argues, "DRI's practice of routinely obtaining them so they could be provided to the insurance companies 'upon request' pervades the entire fraudulent scheme and conspiracy." Id. at 22. Further, the government argues, "DRI sent those false documents to the insurance companies in connection with the jobs at Belterra (Count 4), Clear Creek (Counts 16 & 17), Evans (Count 23), Justen (Count 31), Lusman (Count 37), and Taddonio (Count 53)." Id. "A rational jury," the government argues, "could have found these false subcontractor invoices/proposals were sufficient to support its

17

verdicts in this case." Id.

After carefully examining the record on appeal, we agree with the government that there was sufficient evidence to support Sharp's convictions on Counts 4, 23, 31, 37 and 53.[2] As the government notes, those counts of conviction related to projects in which DRI supplied the insurers at issue with copies of the inflated subcontractor invoices/proposals it had requested from its subcontractors. Quite clearly, those invoices were false because they did not show the true amount that the subcontractors had bid for the work, had expected to receive from DRI, had billed DRI, or were ultimately paid by DRI. In other words, those invoices falsely suggested, in each instance, that DRI was being charged a higher amount by the subcontractor than was actually the case. And DRI's purpose in providing the invoices/proposals to the insurers was to persuade them to pay the inflated amounts so that DRI could reap a profit on the subcontractor's work.

We likewise conclude that the evidence presented at trial was sufficient to support the remaining counts of conviction (Counts 7, 8, 15, 22, 30 and 36) relating to projects in which the insurers did not request DRI to provide copies of the underlying subcontractor invoices/proposals. In each of those circumstances, DRI provided the insurer with an estimate that included at least

---

[2] The jury convicted Griggs on Counts 16 and 17, but was unable to reach a verdict on those counts as to Sharp.

18

one subcontractor line item listing a dollar amount accompanied by a phrase such as "per estimate," "per proposal," "per invoice," or something similarly worded. These statements were true in the sense that the subcontractors at issue had, in fact, provided DRI with proposals matching the dollar amounts listed on DRI's estimates. But the statements omitted or concealed a key material fact: that there was another, lower-priced proposal from the subcontractor that listed the true price that DRI would be paying the subcontractor for its work on the project. Thus, the estimates submitted by DRI to the insurers omitted or concealed a material fact.

Relatedly, the government presented evidence from which a jury reasonably could have found that Sharp and the other defendants acted with the intent to defraud the insurers. To begin with, the government's evidence established that Sharp and the other defendants knew that DRI would make no profit on its subcontractors' work unless it submitted to the insurers estimates that contained inflated prices for the subcontractors' work. The government's evidence further established that DRI's employees, at the direction of Sharp and Griggs, began requiring DRI's subcontractors, as a condition of receiving future work from DRI, to submit two invoices: one listing the actual price that DRI would pay the subcontractor upon completion of the work, and a second listing an inflated price — typically 20-30% higher than the actual price — that DRI would

19

provide to the insurer upon request.[3]  The government's evidence also established that DRI, at the direction of Sharp and Griggs, concealed from insurers the existence of the lower, actual-priced invoices.  When this evidence of intent to defraud is considered in connection with defendants' concealment of the actual subcontractor invoices and prices, the government's evidence was clearly sufficient to allow the jury to convict Sharp on these mail fraud counts.  See generally Schuler, 458 F.3d at 1152 (noting that intent to defraud may be inferred from a variety of circumstantial evidence).

Sharp also makes two specific arguments regarding Counts 37 and 53.  To begin with, Sharp notes that Count 37 "was based upon the fact that DRI provided James Lynch — an independent adjuster for Sentry Insurance — with a copy of a subcontractor proposal for abatement work prepared by Rocky Mountain Abatement."  Sharp Br. at 17.  Sharp asserts that "DRI made no representations that the price to be charged Sentry was identical to what DRI intended to pay for the abatement work."  Id.  Rather, he asserts, "DRI simply quoted a price (which Mr. Lynch determined was both fair and reasonable)."  Id.

As the government notes, however, the subcontractor proposal that DRI provided to Lynch was the higher of the two invoices DRI was provided by

---

[3] As the government aptly notes, "[u]nless Appellants intended to deceive the insurance companies regarding what the subcontractors were charging DRI, there would have been no need to obtain the false subcontractor invoices/proposals."  Gov't Br. at 23.

20

its subcontractor, Rocky Mountain Abatement, and this higher invoice failed to reflect the actual cost that DRI would be paying Rocky Mountain Abatement for its work. Further, Lynch testified at trial that he relied on the accuracy of the Rocky Mountain invoice in determining how much DRI should be reimbursed by Sentry. Tr. at 1635. Consequently, we conclude that this count is not materially distinguishable from the other counts of conviction.

As for Count 53, which related to the Taddonio project, Sharp argues that it "requires a somewhat different analysis." Sharp Br. at 17. Sharp notes that Count 53 "was based upon an estimate provided by DRI which included a subcontractor line item together with the statement that 'actual cost once incurred will be billed.'" Id. (quoting Exhibit 1048). Sharp argues that, "[b]ecause this statement constitutes a representation about something that is to occur in the future, it cannot be 'false' as a matter of law." Id.

The government argues in response that "there was ample evidence for the jury to find that the statements in the DRI estimate for the Taddonio job were false at the time they were made." Gov't Br. at 24. To begin with, the government explains that "[t]he DRI estimate included a subcontractor line item that stated, 'Motorized shades - per proposal from Ananda and Suns' for $4,293.44," and "[b]elow that line item, DRI Employee Justin Blackburn stated, 'The above two line items are uncommon, and may not reflect the actual costs. If this is the case, the actual costs once incur[r]ed will be billed.'" Id. (quoting Ex.

21

App. at 1048). "However," the government notes, "per Mr. Blackburn's instructions, DRI employee Greg Rye had previously obtained from Ananda & Suns . . . two invoices for this work," one "reflect[ing] the $3,484.32 that Ananda . . . intended to charge DRI, and one falsely inflated by 20% to $4,293.44." Id. at 25. And, the government notes, "Blackburn provided the falsely inflated invoice to the insurance company." Id. "This evidence," the government argues, "supports the jury's conclusion that the statements in this DRI estimate were intentionally false at the time they were made because . . . Blackburn knew that Ananda . . . had already agreed to charge DRI a lower price." Id.

We agree with the government. At the time DRI submitted its estimate to the insurance company, it knew that Ananda had bid the job for $3,484.32, approximately $800 less than the amount listed on DRI's estimate. DRI, however, concealed this fact from the insurance company and, instead, listed the higher of the two amounts on its own estimate and in turn provided the insurance company with the invoice from Ananda that falsely suggested Ananda was charging DRI $4,293.44 for its work.

> *2. Was the evidence presented at trial sufficient to establish that the alleged omissions or misstatements were "material"?*

In his second issue on appeal, Sharp challenges his mail fraud convictions on another ground, i.e., that the government's evidence was insufficient to allow the jury to find that any of the alleged omissions or

22

misstatements underlying those counts were "material." Sharp Br. at 20. In support, Sharp argues that "[n]o person of ordinary prudence, engaged in an arm's-length negotiation over the fair and reasonable cost of a restoration project, would rely upon his adversary's representations about the costs associated with that project when those costs can be, and usually are, verified independently." Id. at 21.

"To determine whether a statement is material the appropriate test is to examine whether it has a natural tendency to influence, or is capable of influencing a decision or action by another."[4] United States v. Lawrence, 405 F.3d 888, 901 (10th Cir. 2005). "The question of whether a statement is material is a question of fact for the jury to decide." Id.

We conclude, after viewing the evidence in the light most favorable to the government, that a rational trier of fact could have found beyond a reasonable doubt that the statements at issue in DRI's estimates were material. The phraseology that DRI chose to utilize in describing the subcontractor line items in its own invoices clearly suggested that the dollar figures in those line items were consistent with the amounts that DRI was paying its subcontractors. And DRI perpetuated that false suggestion, when necessary, by providing copies

---

[4] The district court instructed the jury, consistent with law of this circuit, that "[a] false representation or pretense is material if it has a natural tendency to influence or is capable of influencing the decision of a person or entity to whom the representation or pretense is addressed." ROA at 3066.

23

of the inflated subcontractor invoices to insurers upon request. In short, DRI's communications with the insurers suggested that DRI was simply charging the insurers the actual amount that DRI would ultimately pay to its subcontractors. Notably, the insurance adjusters who worked on the projects at issue testified that they relied on the accuracy of this information provided to them by DRI. Thus, DRI effectively lulled the insurance companies and their adjusters into believing there was no need to investigate further the subcontractor line items, or to prepare their own, independent estimates of the costs associated with the subcontractor line items.

> *3. Did the district court err by refusing to instruct the jury that Sharp could be convicted of mail fraud on the basis of an omission only if he had a duty to disclose the withheld fact?*

In his third issue on appeal, Sharp argues that the district court erred by refusing to instruct the jury that Sharp could be convicted of mail fraud on the basis of an omission only if he had a duty to disclose the withheld fact. "We review the district court's decision to give a particular jury instruction for abuse of discretion; however, we review the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." United States v. Toledo, 739 F.3d 562, 567 (10th Cir. 2014).

Sharp is correct in noting "that '[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.'" United

24

States v. Cochran, 109 F.3d 660, 665 (10th Cir. 1997) (quoting Chiarella v. United States, 445 U.S. 222, 235 (1980)).  The question for us in this case is whether Sharp was entitled to have the jury instructed on this legal principle. And that, in turn, depends upon whether such an instruction was "supported by competent evidence."  Pratt v. Petelin, 733 F.3d 1006, 1009 (10th Cir. 2013).

In order to resolve that question, we begin by reviewing the precise arguments that were made by Sharp and his co-defendants prior to the district court instructing the jury.  As previously noted, the district court ultimately instructed the jury, in Instruction No. 28, as to the meaning of a false pretense or representation:

> A representation or pretense is false if it is known to be untrue or it is made with reckless indifference to its truth or falsity.  A representation or pretense can also be false if it is a half-truth or omits or conceals a material fact if it is made with the intent to defraud.

ROA at 3066 (Instruction No. 28).  Prior to the district court doing so, defendants objected to the last sentence of Instruction No. 28, in particular its reference to "omit[ting] or conceal[ing] a material fact."  ROA at 3033-34. Griggs' counsel argued that it was his understanding "that omissions were coming out of the case," leaving at issue "some variety of affirmative misrepresentation." Id. at 3034.  The district court responded, "Omissions are not out of the case. They – omissions that fall within the mid-range of the spectrum that I identified during the ruling [on defendants' motion for judgment of acquittal] are part of the

25

case." Id. Griggs' counsel then stated, "I'll just say that I think if omissions are still in the case, then there should be some instruction about a duty to speak." Id. The district court stated:

> Let me be clear here. I have gone over the counts, and I had a judgment – actually dismissed Count 51, where there was no duty to speak. What I have determined as a matter of law is that a mail fraud claim can be premised on a combination of an affirmative representation coupled with knowledge and omission that renders that representation ambiguous or misleading. ***Cochran*** refers to deceitful concealment of material facts. And that's in conjunction with . . . a representation.

Id. at 3034-35. The district court continued:

> Let me clarify. And to the extent I was not clear in my ruling [on defendants' motions for judgment of acquittal], this will supplement that ruling.
>
> The spectrum that I see is, on one hand, an affirmative misrepresentation. At the other end of the spectrum is a mere non-disclosure, where there is no duty to disclose. That's the ***Cochran*** situation. And midway in between is an affirmative representation which becomes ambiguous or misleading in the absence of a disclosure of additional information. And that is the deceitful concealment of material facts.

Id. at 3035-36. Ultimately, the district court held as follows:

> I find that Instruction No. 28 is an accurate statement of the law when read in conjunction with Instruction No. 25. Instruction No. 25 states the elements that must be proven by the Government with regard to each of the mail fraud claims. It repeatedly uses the phrase "false pretenses or representations." And Instruction No. 28 really defines what is false in that context and it –– read literally, the sentence says, "a representation or a

26

> pretense can be false if it is a half-truth or it omits or
> conceals a material fact." That's premised upon the fact
> that there is a representation or a pretense. It is not
> including a non-disclosure. And as read in that light, the
> jury in applying this definition must find a
> representation or pretense before determining whether it
> is false. That being the case, I find no problem in the
> instruction.

Id. at 3039.

We conclude, for two related reasons, that the district court's analysis was correct. First, as the district court noted, the jury could not have found Sharp guilty based on a mere omission. Rather, Instruction Nos. 25 and 28 required the jury, in the course of considering each of the mail fraud counts, to find the existence of a representation or pretense. Second, and contrary to Sharp's arguments below and now on appeal, none of the counts at issue were based on pure "omissions."[5] Rather, as we have explained, the counts at issue were based on subcontractor line items in DRI's estimates that listed the name of the specific subcontractor and included a dollar amount combined with a phrase such as "per detailed breakdown," "per invoice," "per estimate," and "per proposal." That information, taken together, could reasonably have been understood by the insurers as indicating that the dollar amounts listed by DRI were identical to the amounts being charged DRI by the subcontractors. And,

---

[5] Sharp argues in his opening brief that "[t]he trial court's instructions allowed the jury to convict [him] based upon a pure omission." Sharp Br. at 25. But Sharp points to no evidence to support this argument.

27

whenever an insurance adjuster asked to see a copy of the underlying subcontractor invoice, DRI perpetuated the myth by providing the adjuster with a copy of the inflated subcontractor invoice.[6] Consequently, the district court did not abuse its discretion in refusing to instruct the jury that Sharp could be convicted of mail fraud on the basis of an omission only if he had a duty to disclose the withheld fact.

*4. Did the district court err in giving the jury an Allen instruction?*

In his fourth issue on appeal, Sharp argues that the district court erred by giving the jury an Allen instruction after it informed the district court that it was unable reach a verdict.

*a. Background*

At approximately 1:26 p.m. on its fourth day of deliberations (Thursday, August 9, 2012), the jury sent a note to the district court asking, in effect, whether it was necessary for the defendants to have "know[n] about the statute prohibiting mail fraud in order to be guilty of mail fraud." ROA at 3244-45. The district court responded to the jury as follows: "Please consider the instructions as a whole. The definition of intent for conspiracy is found in Instruction 21. The intent . . . required to commit mail fraud is set out in

---

[6] This occurred in connection with Count 4 (the Belterra job), Counts 16 and 17 (the Clear Creek job), Count 23 (the Evans job), Count 31 (the Justen job), Count 37 (the Lusman job), and Count 53 (the Taddonio job).

Instructions 25 and 27." Id. at 3250.

Little more than an hour later, at 2:44 p.m., the jury sent a note to the district court stating, "Under careful consideration in our deliberations, we, the jury, are unable to return a verdict." Id. at 3251. The note was signed by all twelve jurors. Sharp's counsel argued that the jury's note was a definitive statement that they were unable to reach a verdict, and that the district court should, consequently, declare a mistrial and discharge the jury. Counsel for the other defendants agreed. The district court, however, stated that it was "not inclined to grant the motion for mistrial at this time" because "[t]he jurors have not been instructed that they can reach a verdict on some but not all counts." Id. at 3252-53. In turn, the district court stated that it "intend[ed] to call the jurors into the courtroom and to both reread the modified *Allen* instruction found at Instruction No. 34 and advise them that, one they can continue and should continue their deliberations as to all of the counts that are at issue, and, secondarily, those counts that they can render a verdict on, they should proceed to do so." Id. at 3253. The government had no objection to this proposal, but Sharp's counsel objected, arguing that the district court's proposed instruction would act as "a signal of disapproval" to the jury. Id. at 3254. Griggs' counsel likewise objected. Id. at 3254-55.

The district court proceeded to bring the jury into the courtroom and instruct them as follows:

Ladies and gentlemen of the jury, I have received your communication which we've numbered as Communication No. 13, in which you have stated "Under careful consideration in our deliberations, we, the jury, are unable to return a verdict."

It is not uncommon in the course of deliberations for members of a jury to believe that they have reached an impasse. Sometimes the mere passage of time, taking a break, sometimes a fresh perspective, allows jurors to reach past an impasse. I remind you that Instruction No. 34 tells you that it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. You must each evaluate the evidence for yourself, but only after impartially considering it with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous. However, do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

A verdict in this case is not necessarily a singular verdict. You may render a verdict on any count upon which you can agree. There may be some counts upon which you cannot agree; and in that event, you may not be able to render a verdict.

Your reference here to being able to return a verdict suggests to me that you are thinking that you cannot return a verdict because you cannot agree on all of the counts. I urge you to go back and reconsider and see if there are any of the counts that you can agree on. And if there are counts that you can agree on, to render a verdict on those counts.

Recognizing that you've been working very hard this week, long hours, I think it will be helpful for you, perhaps, to take a break for the rest of the day.

Id. at 3255-56. The jury proceeded, with the agreement of the district

court, to take a three-day break and reconvened on Monday, August 13, 2012. On

30

the afternoon of Wednesday, August 15, 2012, after approximately two-and-a-half days of additional deliberation, the jury reached a partial verdict and was unable to return a verdict on the remaining counts.[7]  Id. at 3277-79, 3281-85.

*b. Analysis*

We review for abuse of discretion a district court's decision to give an Allen charge.  See United States v. Cornelius, 696 F.3d 1307, 1321 (10th Cir. 2012); United States v. Ailsworth, 138 F.3d 843, 851 (10th Cir. 1998).

"A district court may issue an Allen instruction urging deadlocked jurors to review and reconsider the evidence in the light of the views expressed by other jurors so as to avoid a mistrial, provided that the instruction does not impose such pressure on the jury such that the accuracy and integrity of the verdict becomes uncertain."  Cornelius, 696 F.3d at 1321 (internal quotations,

---

[7]  As to the conspiracy charge, which was Count 1, the jury found Sharp and Griggs guilty, but found Blackburn and Travers not guilty.  As to the individual mail fraud counts, the jury found as follows: Count 2 (Griggs, Sharp and Travers all not guilty); Count 4 (Griggs and Sharp guilty); Counts 7-8 (Griggs guilty; unable to reach a verdict as to Sharp); Count 14 (all defendants not guilty); Count 15 (Griggs and Sharp guilty; Blackburn not guilty); Counts 16-17 (Griggs guilty; unable to reach a verdict as to Sharp); Counts 18-19 (Griggs, Sharp and Travers all not guilty); Count 22 (Griggs and Sharp guilty; Travers not guilty); Count 23 (Griggs and Sharp guilty); Counts 24-25 and 27-28 (Griggs, Sharp and Blackburn all not guilty); Counts 30-31 (Griggs and Sharp guilty; Blackburn not guilty); Counts 32-35 (Griggs, Sharp and Blackburn all not guilty); Count 36 (Griggs and Sharp guilty; Blackburn not guilty); Count 37 (Griggs and Sharp guilty; Blackburn not guilty); Counts 41-42, 47-48, 50, 52 (unable to reach a verdict as to any defendant); Count 53 (Griggs and Sharp guilty; unable to reach a verdict as to Blackburn); Counts 56-57 (unable to reach a verdict as to any defendant).

31

alterations, and citations omitted). "In considering whether an <u>Allen</u> instruction was improperly coercive, we consider (1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations." <u>Id.</u> (internal quotation marks and citations omitted). "The ultimate question is whether the instruction was impermissibly coercive in a way that undermined the integrity of the deliberation process." <u>Id.</u> (internal quotation marks, citation and alteration omitted).

We conclude that the district court's <u>Allen</u> instruction in this case was not improperly coercive. To begin with, the district court's statement, "do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous," ROA at 3255, effectively "urged all jurors, not just those in favor of acquittal, to reconsider their views according to the proper standard of the law," <u>Cornelius</u>, 696 F.3d at 1322. The language of the instruction also effectively encouraged, rather than "undermined," the deliberative process. <u>Id.</u> To be sure, the instruction was read alone by the district court after the jury had deliberated for several days and then indicated that it was unable to return a verdict. <u>See</u> <u>United States v. LaVallee</u>, 439 F.3d 670, 690 (10th Cir. 2006) ("[T]here is no per se rule against giving an <u>Allen</u> charge once the jury has begun to deliberate."). But in the present case, the instruction had been previously read to the jury as part of the initial jury instructions, and the district

32

court reminded the jury of that fact. Following the district court's reading of the Allen instruction, the jury proceeded to deliberate for two-and-a-half more days. Notably, the jury did not convict Sharp and Griggs on all of the counts at issue. Indeed, the jury remained deadlocked with respect to several of the counts at issue. And, with respect to defendants Blackburn and Travers, the jury either acquitted them or was deadlocked. Thus, considering all of these factors together, we are not persuaded that the district's Allen instruction imposed such pressure on the jury as to call into question the accuracy and integrity of its verdicts.

Sharp argues, however, that "[t]here are three problems with the language of the court's Allen instruction and its comments regarding a partial verdict that rendered the instruction improperly coercive." Sharp Br. at 29. To begin with, Sharp argues, by telling the jury that "the mere passage of time [or] taking a break . . . allows jurors to reach past an impasse," and then excusing the jury for a three-day break, the district court effectively "encouraged the jurors to take a break with an eye towards any holdouts returning at [a] later time and capitulating." Id. at 30. As we have noted, however, the language of the district court's Allen instruction actually encouraged all of the jurors, and not just the purported "holdouts," to reconsider their views. Further, as the government correctly notes, it was the jury that requested the three-day break; the district court did not unilaterally impose that break on the jury. Thus, we reject Sharp's assertion regarding the "message" sent to the jury by the district court.

33

Sharp next complains that the district court's "instruction did not reiterate the fact that the burden of proof was on the government, and that [he] had no burden to prove anything." Id. Sharp is correct on this point and "[i]t would, of course, be more palatable if the jury [had been] reminded of the presumption of innocence and burden of proof." United States v. Winn, 411 F.2d 415, 417 (10th Cir. 1969). But, as the government notes, the absence of this language is not per se prejudicial. And, importantly, the district court did emphasize to the jurors that they should "not surrender [their] honest conviction[s] as to the weight or effect of evidence solely because of the opinion of . . . fellow jurors or for the mere purpose of returning a verdict." ROA at 3256.

Third, Sharp argues that "the court's instruction improperly interfered with the structure and course of the jury's deliberations by admonishing the jury to return a partial verdict if at all possible." Sharp Br. at 31. But a close examination of the district court's Allen instruction indicates that the district court's reference to the possibility of a partial verdict was clearly intended to alleviate any concerns on the part of the jury "that [they could not] return a verdict because [they could not] agree on all counts." ROA at 3256. Moreover, the district court did not suggest, as was the case in LaVallee, that the jury could or should seal or return partial verdicts as they were reached or prior to the conclusion of the deliberative process. Thus, Sharp's argument in this regard

34

lacks merit.

Finally, Sharp complains about the timing of the Allen instruction, noting that it "was given, not just after the jury had begun its deliberations, but after it had been deliberating for four days, and after it advised the court . . . that it was deadlocked." Sharp Br. at 33. But we have previously upheld the giving of an Allen instruction under nearly the same circumstances as occurred here, i.e., "after the jury deliberated for four days, returned a partial verdict, and announced that it was deadlocked." Ailsworth, 138 F.3d at 851-52. In concluding that "[t]he timing of the Allen instruction[] . . . was not problematic," we noted that "[t]he court first gave an Allen instruction to the jury when it charged the jury before deliberations began." Id. at 851. Notably, the district court in this case did so as well. In other words, the jury in this case was given the Allen instruction for the first time prior to deliberations, and it was reread to them after four days of deliberation. Consistent with Ailsworth, we conclude that this timing was not "problematic." Id.

> *5. Is Sharp entitled to have his convictions vacated under the rule established in Cochran?*

In his fifth and final issue on appeal, Sharp "incorporates by reference the first argument advanced by . . . Griggs in his Opening Brief," i.e., that his convictions must be vacated in light of this court's decision in Cochran. Sharp Br. at 34. As we shall discuss in greater detail below in the section

35

addressing Griggs' appeal, this issue lacks merit.

### B. Griggs' Appeal

Griggs raises six issues in his appeal: a challenge to his convictions based upon this court's decision in Cochran, two sufficiency-of-the-evidence issues (the same two issues raised by Sharp), two instruction-related issues (the same two instruction-related issues as Sharp), and, finally, a challenge to the $500,000 fine imposed by the district court at sentencing. As with Sharp's appeal, we conclude that all of the issues raised by Griggs lack merit.

*1. Is Griggs entitled to have his convictions vacated on the basis of this court's decision in Cochran?*

In his first issue on appeal, Griggs contends that the government's evidence was insufficient to support his convictions. As we have noted, "[w]e review the sufficiency of evidence de novo." Serrato, 742 F.3d at 472.

*a. The Cochran decision*

Griggs bases his sufficiency-of-evidence challenge on our decision in Cochran. The defendant in that case, Robert Cochran, was the head of the Oklahoma City Municipal Bond Underwriting Department of Stifel, Nicolaus & Company (Stifel), a company that participated in underwriting municipal bond issues. Stifel was a co-managing underwriter for almost $77 million in taxable 20-year revenue bonds issued by the Oklahoma City Airport Trust (OCAT). Stifel also, in connection with the deal, brokered a collateralized guaranteed

36

investment contract between OCAT and the Postipankki Bank, a Finnish bank. This contract allowed OCAT to invest the bond proceeds at a fixed rate until needed and earn a return in excess of most short-term investments. Stifel located Postipankki, the highest bidder in terms of the guaranteed interest rate offered, with the help of Pacific Matrix Financial Corporation, a California money broker. At the direction of Stifel, Postipankki reduced slightly the amount of the guaranteed interest percentage it offered in its original bid (Postipankki would have been the highest bidder even based on its net bid) to account for broker fees charged by Stifel and Pacific Matrix. Those fees totaled $529,241.09, of which Stifel received $489,241.09. OCAT was unaware of the fees or that Postipankki's original bid was for a slightly higher guaranteed rate of interest. The return from the guaranteed investment contract earned OCAT more than $1.5 million, and the net rates it earned were over twice what it was making on short-term Treasury securities.

As a result of the OCAT transaction, Cochran was indicted on two counts of wire fraud (specifically a telephone call directing the Postipankki bid reduction and a fax transmission from Pacific Matrix to Oklahoma bond counsel reflecting the reduced bid amount) and one count of money laundering. Cochran was subsequently convicted by a jury of these counts and was sentenced to a term of imprisonment and ordered to pay restitution in an amount equal to the broker fee received in the OCAT transaction.

37

On appeal, Cochran "argue[d] that he had no duty to disclose (to OCAT) the Stifel commission on the guaranteed investment contract placed with Postipankki bank." 109 F.3d at 665. We agreed. In reaching this conclusion, we noted "[t]he evidence in this case does not support [the existence of a fiduciary] duty [between Stifel/Cochran and OCAT], nor does it support the government's alternate theory that Stifel's affirmative misstatements of fact (the net bids) induced false beliefs regarding the amount of the Postipankki bid to OCAT." Id. We emphasized that we "analyze[d] the government's alternate theory virtually the same way as its nondisclosure theory because the alternate theory presupposes a duty to disclose with any statements unaccompanied by such disclosure deemed fraudulent." Id. "The record," we noted, "ma[de] it clear that even among the government's industry witnesses no consensus existed concerning proper reinvestment fee disclosure." Id. at 666. Consequently, we held that "[t]he wire fraud counts pertaining to the OCAT transaction must be reversed." Id. at 667.

*b. The district court's rejection of Griggs' Cochran-based challenge*

Griggs, citing Cochran, moved for a judgment of acquittal on all counts at the conclusion of the government's case, at the conclusion of all the evidence, and after the jury had returned its verdict. The district court dismissed one of the mail fraud counts at issue (Count 51),[8] but rejected Griggs' motions

---

[8] In the project at issue in Count 51, the government's evidence established

(continued...)

with respect to the remaining counts at issue.

### c. Griggs' challenge to the district court's decision

Griggs argues that "[t]he district court's attempt to distinguish this case from <u>Cochran</u> fails." Griggs Br. at 19. In support, Griggs asserts that "[i]n <u>Cochran</u>, the broker [defendant] provided an affirmative representation concerning the interest rate offered to OCAT." <u>Id.</u> "The 'quoted' rate," Griggs asserts, "was less than the 'original' rate the bank was willing to pay," and "[t]hat 'original' rate had been reduced to cover the broker fee to the defendant[]." <u>Id.</u> at 19-20. "In this case," Griggs argues, "the quoted rate for the cost of the subcontractors was higher than the amount actually paid to the subcontractor because the quoted amount included profit and overhead for DRI." <u>Id.</u> at 20. "In other words," he argues, "the 'retail rate' charged to the insurance company included the 'wholesale rate' paid to the subcontractors plus a markup for profit and overhead." <u>Id.</u> He argues that "DRI's estimates for the insurance companies accurately represented what DRI was charging for the work of the subcontractors but omitted disclosing the amount of the markup DRI was charging for that work." <u>Id.</u> "In <u>Cochran</u>," he argues, "the quoted rate to OCAT was what the bank was paying, but omitted disclosing that the bank had reduced the rate it was

---

[8](...continued)
that DRI dealt exclusively with the property owner, Steve Rosen, who was acting as his own general contractor overseeing the repair of his property. In other words, DRI did not make any representations to Rosen's insurance company.

39

willing to pay in order to cover the cost of the broker fee." Id.

Ultimately, Griggs argues that, "[s]ince it is not contested that DRI had no duty to disclose to the insurance companies, this case is controlled by the holding in Cochran." Id. "Indeed," Griggs argues, "the relationship between DRI and the insurance companies was much more arms-length than that between the broker and OCAT in Cochran." Id. According to Griggs, "[u]nder these facts, DRI charging the insurance companies a retail price for the work of subcontractors without disclosing that the subcontractors were paid a wholesale amount, when there was no duty of disclosure, cannot be deemed a nondisclosure coupled with an affirmative misrepresentation which induced a false belief among the insurers." Id. at 21.

We reject Griggs' arguments and conclude that the district court correctly distinguished this case from Cochran. The basis for the fraud charges in Cochran was the defendant's nondisclosure of information to OCAT. Although the defendant in Cochran truthfully informed OCAT of the guaranteed interest rate it would receive from the bank, he failed to disclose to OCAT (a) the fact that the bank had originally offered a slightly higher guaranteed interest rate, (b) the fact that he and Stifel would be receiving a commission from the bank, and (c) the fact that the bank effectively paid for the commission by lowering slightly the amount of the guaranteed interest rate.

The case at issue involving DRI, in contrast, involves more than the

40

nondisclosure of information. In each of the counts at issue, DRI submitted to an insurance company a written estimate that included one or more line items listing work to be performed by a subcontractor, along with a dollar amount and a phrase such as "per detailed breakdown," "per invoice," "actual cost . . . per invoice," "per estimate," or "per proposal." This information was truthful only in the sense that the amount listed on the subcontractor line item matched one of the two invoices submitted by the subcontractor to DRI. What DRI's estimate failed to inform the insurer, however, was that the matching invoice was generated by the subcontractor only at DRI's request and solely for the purpose of hiding the fact that DRI was paying the subcontractor a lesser amount, and DRI was receiving the difference. By structuring its estimates and supporting documentation in this manner, DRI falsely suggested to the insurer that the amount listed on the subcontractor line item was the precise amount that DRI would be paying the subcontractor for its work. Thus, in sum, the case at hand did not involve a mere nondisclosure, but rather involved an affirmative representation combined with a related nondisclosure. Together, these affirmative acts coupled with material omissions resulted in the deceitful concealment of material facts from the insurers.

Griggs also argues that, "[b]ecause one cannot be guilty of conspiring to do something that is not a crime, the failure of the government to present sufficient evidence of mail fraud means there is insufficient evidence to

41

sustain [his] conspiracy conviction." Griggs Br. at 21. This argument, however, fails for the reasons outlined above, i.e., there was sufficient evidence to support his convictions for mail fraud.

Finally, Griggs argues that criminalizing the conduct at issue in this case violates due process. Id. at 22. This argument, like his other Cochran-based argument, rests largely, if not exclusively, on the notion that the conduct at issue involved the mere nondisclosure of information. In particular, Griggs argues that criminalizing the conduct at issue in this case retroactively imposed a duty on him and his codefendants, as private individuals, to disclose information in private business transactions. Id. Griggs also argues that "typical commercial actors, such as the defendants in this case, could not have contemplated or appreciated the fine lines drawn by the district court." Id. at 23. Consequently, he argues, "constitutional notice of what constituted criminal conduct was not provided," and his convictions must therefore be reversed. Id.

"[D]ue process requires citizens be given fair notice of what conduct is criminal." United States v. Apollo Energies, Inc., 611 F.3d 679, 687 (10th Cir. 2010). "A criminal statute cannot be so vague that 'ordinary people' are uncertain of its meaning." Id. (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)). "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not

42

encourage arbitrary and discriminatory enforcement." <u>Kolender</u>, 461 U.S. at 357.

The mail fraud statute Griggs was convicted of violating, 18 U.S.C. § 1341, makes it a crime to engage in a scheme or artifice to defraud or obtain money or property "by means of false or fraudulent pretenses, representations, or promises." As the district court's instructions in this case correctly informed the jury, a representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity, and a representation is "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud. <u>Tenth Circuit Pattern Jury Instructions, Criminal</u>, § 2.56 (2011).

Notably, Griggs does not appear to dispute that the mail fraud statute adequately placed him on notice that it was illegal to engage in a scheme or artifice to obtain money by means of false statements. Rather, his due process arguments appear to be confined to the mere nondisclosure of information. As we have explained, however, the government's case against Griggs, Sharp and their codefendants did not rest on the mere nondisclosure of information. Rather, the government's case focused on half-truths or representations that effectively omitted or concealed material facts. Moreover, it is worth noting that the manner in which Griggs and Sharp structured their system of subcontractor invoicing (requiring subcontractors to submit two invoices), combined with the manner in which DRI provided estimates to insurers (falsely implying that the amounts

43

listed for subcontractor work were the actual amounts to be paid by DRI to the subcontractors), clearly suggested that Griggs and Sharp knew that insurers would not, if they knew all of the facts, pay DRI the inflated subcontractor amounts listed on its estimates. Indeed, the government's evidence established that Sharp told DRI employees during a meeting concerning this system of subcontractor invoicing "that if the insurance companies found out what we were doing, our life would end as we know it." ROA at 130 (testimony of Greg Rye, former project manager at DRI). Consequently, we conclude there is no merit to Griggs' due process arguments.

### 2-5. *Incorporation of issues raised by Sharp*

In his second, third, fourth, and fifth issues on appeal, Griggs incorporates by reference four of the arguments asserted by Sharp: that the evidence presented at trial was insufficient to establish that he obtained money by false pretenses or representations; that the evidence presented at trial was insufficient to establish that the alleged omissions or misstatements were material; that the district court erred by refusing to instruct the jury that Griggs could be convicted on the basis of a material omission only if he had a duty to disclose the withheld fact; and that the district court erred by giving the jurors an Allen instruction after they indicated that they could not reach a unanimous verdict. Griggs Br. at 25-27. For the reasons we outlined in addressing Sharp's appeal, we conclude that these issues lack merit.

44

*6. Was the $500,000 fine imposed by the district court unreasonable?*

In his sixth and final issue on appeal, Griggs challenges the procedural and substantive reasonableness of the $500,000 fine that was imposed by the district court as part of his sentence. In particular, Griggs argues that the fine imposed in his case "is procedurally unreasonable because . . . the district court (1) failed to calculate the Guideline range fine, (2) failed to explain why it was necessary to deviate from the Guideline-range fine urged by the government or reject the $15,000 fine recommended in the PSI to accomplish its sentencing goal; [sic] (3) neither considered nor accounted for restitution of more than $477,000 that . . . Griggs was ordered to pay; and (4) did not consider the burden the fine placed on . . . Griggs' wife and daughter who are dependent on him at a time the court also was imposing a 50-month term of imprisonment." Griggs Br. at 32. Griggs also argues that the fine is substantively unreasonable for these same reasons. Id. at 36 ("The failings that render this fine procedurally unreasonable also make this fine substantively unreasonable and an abuse of discretion.").

*a. Procedural background*

The presentence investigation report (PSR) recommended that a fine in the amount of $15,000 be imposed against Griggs. Griggs agreed with this recommendation. The government, however, objected to this recommendation and argued that a fine of $125,000, an amount at the top of the Guidelines range,

45

was warranted.

At Griggs' sentencing hearing, the government argued that Griggs had hidden assets during the course of the probation office's presentence investigation. In particular, the government argued that Griggs "actively misled" the probation officer "about his current control and ownership of Restoration Logics," a company that had taken over DRI's business, "through his ownership and control of [a third entity called] JENMAR." Griggs App. at 448.

The district court agreed with the government on this point. In the course of pronouncing Griggs' sentence, the district court found that the presentence investigation "[wa]s sort of a cat and mouse game" in which "Griggs did not come forward and disclose voluntarily all of his financial information." Id. at 467. In particular, the district court noted that Griggs failed to provide information to the probation officer regarding a number of "assets and transfers that [were] made during the course of this case." Id. at 468. This included, the district court noted, information regarding "the actual worth of Restoration Logistics, which bought out DRI," "whether this was an asset sale or a stock sale," "what purchase price was paid," and how much Griggs received from the sale of DRI. Id. at 467. The district court also "f[ound] some of the representations that . . . Griggs made to the probation officer to be somewhat insincere and incredible." Id. at 469. Ultimately, the district court found that there was an "attempt [by Griggs] to shelter assets from collection in anticipation

46

of imposition of a restitution amount and a forfeiture award and a fine." Id. And Griggs' actions in that regard, the district court stated, factored into its sentencing decisions. Id.

The district court adopted most of the information contained in the PSR and found that Griggs' "Total Offense Level [wa]s 27," and his "Criminal History Category [was] I," resulting in a guideline sentencing range "of 70 to 87 months, 1 to 3 years of supervised release on each count, a fine of $12,500 to $3,500,000, and a special assessment of $100 per count." Id. at 463. The district court then imposed a below-Guidelines term of imprisonment of fifty months, "followed by 3 years of supervised release, a fine of $500,000, a restitution obligation of [$]477,643.49, . . . and a special assessment of $1,400." Id.

After imposing this sentence, the district court asked if "there [was] any need for clarification, further explanation, objection, or request for continuance?" Id. The prosecutor asked if the district court "could . . . make a record as to why that particular $500,000 [fine] number was chosen" since it was "above the guideline range." Id. at 471. The district court responded: "The guideline range is $12,500 to 3,500,000." Id. The prosecutor then stated, "The top end of that range that you cited is the statutory maximum allowed by the counts of conviction," but "the guideline range . . . for an offense category of 27

47

is $12,500 to $125,000."[9]  Id.  The district court responded, "This is a variant

sentence."  Id. at 472.  Pursuant to the prosecutor's request, the district court then

specified its reasons for imposing a fine that varied from the Guidelines range:

> I carefully studied the financial information that was contained in the presentence report, that which was supplied, including the income that was reported by Mr. Griggs over years 2006 through 2011.  2006, it was $696,000; 2007, $292,000; 2008, $385,000; 2009, $174,000; 2010, $358,000; and 2011, $273,000.  Given that amount of income and the relatively small number of assets that are reflected in the presentence report, I believe both that Mr. Griggs has a capacity to earn money, and I suspect that the disclosure of the assets that were acquired during that time is not accurate or complete.

Id.

> Immediately following its explanation, the district court asked

Griggs' counsel if he had any response.  Id. at 473.  Griggs' counsel responded:

> Of course, Your Honor, we continue and persist in the position that the fine should be imposed within the fine range, especially given that the counts were grouped in this case.  We understand the Court's ruling.  I think our position is already made known and clear in the record.  But we think the fine at the level announced by the Court is inappropriate and that the fine should be

---

[9] A review of the record suggests that the district court's misunderstanding of the guideline fine range derived from the original and revised PSRs, both of which stated erroneously that "[t]he fine range is from $12,500 to $3,500,000, pursuant to §5E1.2(c)(3)."  Dist. Ct. Docket Nos. 1530 and 1558 at ¶ 110.  Notably, neither Griggs nor the government objected to this portion of either PSR.  Thus, it was not until the time of sentencing that the prosecutor brought this error to the district court's attention.

imposed within the guideline range.

Id. The district court then asked, "Even though this is a variant sentence?" Id. Griggs' counsel responded, "I understand that it's a variant sentence, but it's not on the Government's motion. And I think I've made my record." Id.

*b. Standard of review*

Generally speaking, we review sentences, including fines, for reasonableness under a deferential abuse-of-discretion standard. See United States v. Vigil, 644 F.3d 1114, 1123 (10th Cir. 2011). "Reasonableness review is a two-step process comprising a procedural and a substantive component." United States v. Friedman, 554 F.3d 1301, 1307 (10th Cir. 2009) (internal quotation marks omitted). "Procedural reasonableness involves using the proper method to calculate the [fine]." United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007). Substantive reasonableness, in contrast, involves whether the amount of the fine at issue is reasonable given all the circumstances of the case in light of the statutory and Guidelines factors. See generally United States v. Sayad, 589 F.3d 1110, 1116 (10th Cir. 2009).

The government argues, however, and we agree, that plain error review applies to Griggs' challenges to the procedural reasonableness of the fine imposed by the district court. As outlined above, Griggs' counsel argued only that the fine was "inappropriate" and should fall "within the guideline range." App. at 473. Nothing about these general objections was sufficient to alert the

49

district court to the more-specific procedural objections that Griggs now asserts on appeal. Accordingly, we conclude that Griggs' objections to the procedural reasonableness of his fine are unpreserved and thus subject to review only for plain error. See United States v. Romero, 491 F.3d 1173, 1177-78 (10th Cir. 2007). "We find plain error only when there is (1) error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 1178.

*c. Analysis*

Griggs' first two procedural challenges, i.e., that the district court failed to calculate the Guidelines range for the fine and failed to explain its reasons for deviating from the Guidelines range, are without merit. Although the PSR misstated the upper end of the Guidelines fine range, neither party objected to that error. Thus, it was not until the time of sentencing, when the district court expressly adopted the Guidelines fine range stated in the PSR, that the prosecutor realized the error and brought it to the attention of the district court. The district court in turn recognized the error and thus effectively adopted the proper Guidelines fine range as outlined by the prosecutor. The district court also, at the urging of the prosecutor, explained its reasons for imposing a fine that varied above the Guidelines range. Consequently, there was no procedural error in this regard, and thus no plain error.

Griggs' latter two procedural arguments also lack merit. To be sure,

50

the district court did not expressly discuss the interplay of the restitution and fine that it imposed, nor did it discuss any potential burden the fine might place on Griggs' wife and daughter. But the district court did, in explaining its reasons for imposing an above-Guidelines-range fine, find that Griggs had hidden assets from the probation office, or at least effectively prevented the probation office from discovering substantial assets. As a result of this conduct, the district court clearly concluded that both restitution and a substantial fine were appropriate and warranted. Notably, Griggs makes no effort to challenge the district court's finding on this point. Consequently, he has failed to establish that any error on the part of the district court affected his substantial rights, or otherwise seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

Having concluded that the district court's sentencing decision was "procedurally sound" under the plain error standard of review, we are left to "consider the substantive reasonableness of the [fine] imposed under an abuse-of-discretion standard." Gall v. United States, 552 U.S. 38, 51 (2007). In doing so, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Id. Because the fine in this case "is outside the Guidelines range," we "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id.

The extent of the variance of the fine imposed in this case was, to be

sure, substantial. Although the upper end of the Guidelines range fine was $125,000, the district court concluded that a fine four times greater than the upper end of the Guidelines range, i.e., $500,000, was warranted based upon its findings that Griggs attempted to conceal assets from the probation office during its presentence investigation. The question for us is whether, giving due deference to the district court's decision, the circumstances of this case, including Griggs' conduct during the presentence investigation, justified the extent of the variance.

Two of the Application Notes to U.S.S.G. § 5E1.2 provide useful guidance in making our determination. To begin with, Application Note 4 provides that a significant amount of loss may justify a fine that exceeds the Guidelines range:

> The [Sentencing] Commission envisions that for most defendants, the maximum of the guideline fine range from subsection (c) will be at least twice the amount of gain or loss resulting from the offense. Where, however, two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted.

> Moreover, where a sentence within the applicable fine guideline range would not be sufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged (e.g., by restitution or forfeiture) and an adequate punitive fine, an upward departure from the fine guideline range may be warranted.

U.S.S.G. § 5E1.2, cmt. n.4. In this case, it was undisputed that the amount

52

of loss caused by Griggs' conduct was $477,643.49. Because "two times" this amount of loss ($955,286.98) greatly "exceeds the maximum of the fine guideline" ($125,000), this is, without question, a case where it was appropriate for the district court to consider "an upward departure" or variance "from the fine guideline range." Id.

Application Note 6 also provides that "[t]he existence of income or assets that the defendant failed to disclose may justify a larger fine than that which otherwise would be warranted under this section." U.S.S.G. § 5E1.2, cmt. n.6. That certainly captures the situation before us. As we have noted, the district court expressly found that Griggs concealed assets from the probation office during the course of its presentence investigation. And Griggs, though now challenging the amount of the fine imposed, makes no attempt to challenge the district court's findings regarding his concealment of assets.

We are persuaded from reviewing the transcript of the sentencing hearing that the district court's decision to impose a $500,000 fine on Griggs was consistent with Application Notes 4 and 6. Not only was the district court well aware of the amount of loss at issue, it expressly emphasized, and expressed displeasure with, Griggs' efforts to conceal assets during the presentence investigation. And it was this latter factor that the district court mentioned when asked by government counsel to explain its reasons for varying upward from the Guidelines range.

53

The only potentially unusual factor in this case, and the one that appears to concern the dissent, was the district court's decision, when informed by the government that the upper end of the Guidelines range was $125,000 rather than $3,500,000, to stick with the amount of the fine that it originally selected and vary upwards from the Guidelines range. We are not persuaded, however, that this circumstance renders the amount of the fine "arbitrary, capricious, whimsical, or manifestly unreasonable." United States v. Naramor, 726 F.3d 1160, 1171 (10th Cir. 2013) (internal quotation marks omitted). To the contrary, we are convinced that the district court in this case carefully selected the amount of the fine — approximately equal to the amount of the loss associated with Griggs' offense — both to ensure the disgorgement of any gain from the offense and to ensure that Griggs was adequately punished for his offense and for his concealment of assets during the presentence investigation.

Thus, in sum, we conclude that the amount of the fine imposed by the district court was substantively reasonable.

### III

Having rejected each of the claims for relief asserted by Sharp and Griggs, we AFFIRM their convictions and sentences.

**No. 13-1114,** *United States v. Sharp***; No. 13-1117,** *United States v. Griggs*

**HOLLOWAY**, Circuit Judge, concurring in part and dissenting in part.

I join the majority in affirming the convictions of both Charles Sharp and Michael Griggs. Like the majority, I also believe that Mr. Griggs's challenge to the procedural reasonableness of his sentence must be reviewed for plain error only. But the majority and I part company on the question of the substantive reasonableness of Mr. Griggs's fine itself. I am unable to assent to the majority's conclusion that the district court's imposition of a $500,000 fine on Mr. Griggs was substantively reasonable "given all the circumstances of the case in light of the factors set forth in § 3553(a)." *United States v. Sayad*, 589 F.3d 1110, 1116 (10th Cir. 2009) (brackets and internal quotation marks omitted). Accordingly, I would vacate the $500,000 fine imposed on Mr. Griggs and remand to the district court for resentencing.

A "'sentence' is broadly defined to include not just terms of imprisonment, but also . . . fines." *United States v. Perez–Jiminez*, 654 F.3d 1136, 1146 (10th Cir. 2011); *see also* 18 U.S.C. § 3551(b)(2) ("An individual found guilty of an offense shall be sentenced . . . to . . . a fine . . . ."). When determining the amount of a fine, a district court is bound to consider "the burden that the fine will impose upon . . . any person who is financially dependent on the defendant." 18 U.S.C. § 3572(a)(2). The district court also must take into account "whether restitution is ordered or made and the amount of such restitution." *Id.* § 3572(a)(4). As to the latter point, "the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution." *Id.* § 3572(b). These statutory requirements

are mirrored in the Guidelines themselves. *See* U.S.S.G. § 5E1.2(d)(3)-(4) ("In determining the amount of the fine, the court shall consider . . . the burden that the fine places on the defendant and his dependents relative to alternative punishments [and] any restitution or reparation that the defendant has made or is obligated to make . . . ."). The district court uttered not a word about the factors emphasized above.

We review a sentence for substantive reasonableness under an abuse-of-discretion standard. *See Sayad*, 589 F.3d at 1116. A district court abuses its discretion when it imposes a sentence that is "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Muñoz–Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008) (quotation omitted). Having considered the totality of the circumstances in this case, I am left with the firm impression that the district court exceeded the bounds of reasonableness by imposing an arbitrary fine on Mr. Griggs without fairly considering the fine's consequences.

Despite having an obligation to do so, the district court did not consider the burden that a heavy fine would place on Mr. Griggs's wife and daughter. It likewise neglected to take into account whether such a formidable fine would also impair Mr. Griggs's ability to make restitution, which had been ordered in the amount of $477,643.49. The government admits the district court procedurally erred in both respects. *See* Appellee's Consolidated Answer Br. at 45-46. The district court also calculated Mr. Griggs's fine while working under the mistaken belief (courtesy, it appears, of an incorrect figure given by the probation office in the presentence investigation report) that the high end of his Guidelines fine range was $3,500,000, rather than $125,000. The much higher

$3,500,000 figure represents the statutory maximum fine for Mr. Griggs's offense, not the actual Guidelines fine relevant to his case.

It is evident that the district court was not advised until the very moment of sentencing that the $500,000 fine varied significantly upward from the upper range of the Guidelines. Yet, when presented with this information at Mr. Griggs's sentencing hearing, the district court still stubbornly adhered to the $500,000 amount, deciding on the fly that Mr. Griggs's fine would now be a variant one. This was done without discussing the burden that the highly variant fine would put on Mr. Griggs's family or how that fine would affect his no-less-substantial responsibility to pay restitution. None of this inspires confidence in the majority's conclusion that the $500,000 fine was, on balance, a reasonable one.

The district court's significant procedural errors—admitted by the government—cannot help but bleed into the question whether the fine, viewed in its totality, was substantively reasonable. I believe the district court's lack of awareness of the Guidelines range (and lack of willingness to revisit its position once being made aware of the correct Guidelines range at the sentencing hearing) made it inevitable that the amount of the fine imposed would be colored by arbitrariness. And such arbitrariness is, by its very nature, unreasonable.

When fashioning a sentence for someone judged guilty of a crime, a court must consider how that sentence will "promote respect for the law, and . . . provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). An arbitrary sentence furthers neither of these goals. In light of the district court's initial miscalculation of the fine

-3-

under the Guidelines, its failure to revisit the amount of the fine after being informed of the correct sentencing range, and the fact that it did not consider the assuredly significant impact of a sizeable fine on Mr. Griggs's wife and daughter or on his obligation to pay restitution, I am convinced the $500,000 fine imposed on Mr. Griggs was manifestly unreasonable due to its arbitrariness and thus should not be allowed to stand. Although I am "well aware that the district court is in a 'superior position to find facts and judge their import under § 3553(a),'" *United States v. Friedman*, 554 F.3d 1301, 1310 (10th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)), I believe this is precisely a case where highly pertinent facts were *not* found, much less carefully weighed, by the district court, resulting in the imposition of an arbitrary, unreasonable, and likely excessive fine.

True, the district court still might have come up with the $500,000 amount *even if* it had been correctly advised of the Guidelines range in the first place, *even if* it had considered the burden of the fine on Mr. Griggs's wife and daughter, *even if* it had taken into account the interplay of the fine with the restitution amount, and *even if* it had paused for even a few minutes at Mr. Griggs's sentencing hearing to process the fact that it had just been informed it had calculated a fine using a Guidelines range that was wildly off-base. And, to be sure, the district court's finding that Mr. Griggs had concealed assets must also be given its due weight. But with so much guesswork already required, I decline to speculate about whether the district court, in effect, arrived at the right destination with the wrong roadmap. I would avoid further conjecture and post hoc rationalization by vacating Mr. Griggs's fine and remanding the matter for a new

-4-

sentencing hearing—the only thing, at this point, that can provide the necessary assurance that Mr. Griggs's fine has not been arbitrarily imposed.

Although in all other respects fully concurring in today's opinion, I respectfully dissent from the majority's affirmance of the $500,000 fine imposed on Mr. Griggs by the district court.